**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUNOCO PIPELINE L.P.,

                Plaintiff,

    v.

U.S. DEPARTMENT OF TRANSPORTATION,
PIPELINE AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION, PETER
BUTTIGIEG, SECRETARY OF THE
DEPARTMENT OF TRANSPORTATION, IN
HIS OFFICIAL CAPACITY, AND TRISTAN
BROWN, ACTING ADMINISTRATOR OF THE
PIPELINE AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION, IN HIS
OFFICIAL CAPACITY,

                Defendants.

Civil Action No. 1:21-cv-01760-TSC

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

ALLEGATIONS OF THE VERIFIED COMPLAINT .............................................. 2

STANDARD OF REVIEW ....................................................................................... 8

ARGUMENT .............................................................................................................. 10

    I.    THE COURT'S REVIEW IS LIMITED TO THE GROUNDS INVOKED
        IN PHMSA'S FINAL DETERMINATION ................................................ 10

    II.    THE TRADE SECRETS ACT AND APPLICABLE DOT
        REGULATIONS PRECLUDE DISCLOSURE OF THE RISK
        CONSEQUENCE MODELING DATA ........................................................ 12

        A.    The Trade Secrets Act Bars PHMSA from Releasing Information
            Subject to Exemption 4 ................................................................. 12

        B.    DOT Regulations Bar PHMSA from Releasing Information
            Subject to Any FOIA Exemption ................................................. 14

    III.    SUNOCO SUFFICIENTLY ALLEGES THAT THE RISK
        CONSEQUENCE MODELING DATA FALLS WITHIN EXEMPTION
        7(F) .......................................................................................................... 17

        A.    Defendants' Motion to Dismiss Relies on Grounds Outside of the
            Final Determination ...................................................................... 17

        B.    Sunoco Has Adequately Alleged that FOIA Exemption 7(F)
            Applies. ......................................................................................... 17

        C.    PHMSA's Balancing of the Risks and Benefits of Disclosure is
            Clear Error .................................................................................... 20

    IV.    SUNOCO SUFFICIENTLY ALLEGES THAT THE RISK
        CONSEQUENCE MODELING DATA IS COMMERCIAL
        INFORMATION UNDER EXEMPTION 4 ........................................... 24

        A.    Defendants Misstate the Scope of "Commercial Information"
            under FOIA. ................................................................................... 24

        B.    Sunoco Has Adequately Alleged a Commercial Interest in the
            Consequence Modeling Data ......................................................... 27

CONCLUSION ........................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100Reporters LLC v. U.S. Dep't of Just.*,
248 F. Supp. 3d 115 (D.D.C. 2017) ..................................................................24

*AAR Airlift Grp., Inc. v. U.S. Transp. Command*,
161 F. Supp. 3d 37 (D.D.C. 2015) ......................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................8, 14, 19

*\*Baker & Hostetler LLP v. U.S. Dep't of Com.*,
473 F.3d 312 (D.C. Cir. 2006) ...........................................................25, 26, 27, 28

*Besson v. U.S. Dep't of Com.*,
480 F. Supp. 3d 105 (D.D.C. 2020) ...................................................................25

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) .......................................................................................10

*\*Campaign for Fam. Farms v. Glickman*,
200 F.3d 1180 (8th Cir. 2000) ......................................................................14, 15

*Canadian Com. Corp. v. Dep't of the Air Force*,
514 F.3d 37 (D.C. Cir. 2008) ...........................................................................13

*Chi. Trib. Co. v. FAA*,
No. 97-2363, 1998 WL 242611 (N.D. Ill. May 7, 1998) ............................................27

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
436 F. Supp. 3d 354 (D.D.C. 2020) .....................................................................9

*\*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
No. 19-cv-3626, 2021 WL 4502039 (D.D.C. Sept. 30, 2021) ...............................24, 25, 28

*CNA Fin. Corp. v. Donovan*,
830 F.2d 1132 (D.C. Cir. 1987) .....................................................................13, 14

*\*Critical Mass Energy Project v. Nuclear Regul.Comm'n*,
830 F.2d 728 (D.C. Cir. 1987) .........................................................25, 26, 27, 28

*\*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
117 F. Supp. 3d 46 (D.D.C. 2015) ......................................................24, 25, 28

*FTC v. Mandel Bros., Inc.,*
  359 U.S. 385 (1959) ............................................................................................ 14

*Gen. Elec. Co. v. Dep't of the Air Force,*
  648 F. Supp. 2d 95 (D.D.C. 2009) ...................................................................... 10

*\*Greenpeace, Inc. v. Dep't of Homeland Sec.,*
  311 F. Supp. 3d 110 (D.D.C. 2018) .............................................................. 17, 20

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,*
  502 U.S. 183 (1991) ............................................................................................ 15

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271, 1276 (D.C. Cir. 1994) .................................................................... 9

*Living Rivers v. U.S. Bureau of Reclamation,*
  272 F. Supp. 2d 1313 (D. Utah 2003) ................................................................. 22

*Mallinckrodt v. West,*
  140 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................ 14

*Marsh v. Ore. Nat. Res. Council,*
  490 U.S. 360 (1989) ........................................................................................ 9, 24

*\*McDonnell Douglas Corp. v. NASA,*
  180 F.3d 303 (D.C. Cir. 1999) ............................................................................ 13

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................... 10, 11, 16, 24, 27, 29

*Mount Royal Joint Venture v. Kempthorne,*
  477 F.3d 745 (D.C. Cir. 2007) ............................................................................ 10

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ................................................................................ 10

*N. Air Cargo v. U.S. Postal Serv.,*
  674 F.3d 852 (D.C. Cir. 2012) ............................................................................ 16

*\*Nat'l Ass'n of Home Builders v. Norton,*
  309 F.3d 26 (D.C. Cir. 2002) ........................................................................ 24, 27

*Nat'l Bus. Aviation Ass'n, Inc. v. FAA,*
  686 F. Supp. 2d 80 (D.D.C. 2010) ........................................................................ 9

*Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.,*
  849 F. Supp. 2d 13 (D.C. Cir. 2012) ................................................................... 18

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,*
    358 F. Supp. 3d 66 (D.D.C. 2019) ........................................................................12

*Northrop Grumman Sys. Corp. v. NASA,*
    346 F. Supp. 3d 109 (D.D.C. 2018) ......................................................................13

*Pinson v. Dep't of Just.,*
    236 F. Supp. 3d 338 (D.D.C. 2017) ......................................................................21

*Pub. Citizen Health Rsch. Grp. v FDA,*
    704 F.2d 1280 (D.C. Cir. 1983) ..........................................................24, 25, 26, 28

*\*Pub. Emps. for Env't Resp. v. U.S. Sec., Int'l Boundary & Water Comm'n,*
    740 F.3d 195 (D.C. Cir. 2014) ..................................................................18, 20, 22

*\*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ....................................................................................10, 16

*Sluss v. U.S. Dep't of Just.,*
    No. 1:17-CV-00064, 2019 WL 2493447 (D.D.C. June 14, 2019) ...........................20

*Sparrow v. United Air Lines, Inc.,*
    216 F.3d 1111 (D.C. Cir. 2000) ....................................................................9, 13, 19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    249 F Supp. 3d 516 (D.D.C. 2017) ......................................................................21

*Teva Pharms., USA, Inc. v. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) ..........................................................................16

*\*Worthington Compressors, Inc. v. Costle,*
    662 F.2d 45 (D.C. Cir. 1981) ..................................................................14, 15, 16

*Zhang v. U.S. Citizen & Imm. Servs.,*
    978 F.3d 1314 (D.C. Cir. 2020) ..........................................................................15

**Statutes**

5 U.S.C. § 552(b) ..................................................................1, 14, 15, 16, 18, 20

5 U.S.C. § 706(2) ..........................................................................................1, 9

18 U.S.C. § 1905 ............................................................................................12

**Regulations**

49 C.F.R. § 7.2 ..............................................................................................14

49 C.F.R. § 7.13 ............................................................................................15

49 C.F.R. § 7.23 ...................................................................................14, 15, 16, 17

49 C.F.R. § 190.343 .........................................................................................17

49 C.F.R. § 195.440 .........................................................................................21

**Other Authorities**

Final Rule, *Public Availability of Information*, 79 Fed. Reg. 16,207 (Mar. 25,
    2014) .......................................................................................................15

U. S. Gov't Accountability Off., GAO-19-48, *Critical Infrastructure Protection
    Actions Needed to Address Significant Weaknesses in TSA's Pipeline Security
    Program Management* (Dec. 2018) .........................................................20

U.S. Dep't of Just., *Guide to the Freedom of Information Act: Exemption 4* (2019) ....................26

# INTRODUCTION

This case involves the government's planned unwarranted disclosure of confidential risk consequence modeling data that specifies the precise distances from Sunoco Pipeline L.P.'s ("Sunoco's") Mariner East 2 ("ME2") pipeline at which individuals may be most harmed by a potential pipeline rupture.  Verified Complaint (ECF 1) ("Compl.") ¶ 18.  Sunoco, other pipeline operators, other agencies, and, until now, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") have all routinely recognized the confidential and highly sensitive nature of this type of information under longstanding exemptions to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Compl. ¶¶ 20-21, 23.  If publicly disclosed, the results of Sunoco's confidential risk consequence modeling will impair Sunoco's ability to safely operate the ME2 pipeline and could be used by a terrorist or criminal to cause severe harm to the populations living along the ME2 pipeline.  *Id.* ¶ 22.  To prevent that result, Sunoco initiated this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

At this stage in the proceedings, the only relevant question before the Court is whether Sunoco has properly alleged a viable claim under the APA—a burden that Sunoco has well exceeded.  As provided in the Complaint, the information at issue is subject to the protections of two FOIA exemptions: Exemption 7(F)[1] and Exemption 4.[2]  Sunoco has consistently demonstrated in its submissions to PHMSA since 2018 that the information could be used to endanger those living in the areas surrounding the pipeline (and is thus protected under FOIA Exemption 7(F))

---

[1] FOIA Exemption 7(F) provides that FOIA "does not apply to . . . records or information compiled for law enforcement purposes, but only to the extent that the product of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7).

[2] FOIA Exemption 4 provides that FOIA  "does not apply to . . . trade secret and commercial or financial information obtained from a person [that is] privileged and confidential." 5 U.S.C. § 552(b)(4).

and would interfere with Sunoco's commercial interests in the pipeline (and is thus protected under Exemption 4).  PHMSA largely ignored Sunoco's allegations on these issues, often applying an incorrect legal standard, and its decision to release the risk consequence modeling data is arbitrary and capricious in violation of the APA.

Defendants' Motion to Dismiss fails to refute this analysis.  At a fundamental level, Defendants violate a basic tenet of administrative law—that the propriety of an agency's action is judged solely on the grounds invoked by the agency.  Throughout their motion, Defendants repeatedly go beyond PHMSA's rationale for disclosing the risk consequence modeling data.  In particular, Defendants now assert PHMSA's unbridled discretion to disclose the confidential risk consequence modeling data.  This argument extends well beyond the grounds of PHMSA's decision and, in any event, is plainly contradicted by well-established authority in this Circuit and controlling Department of Transportation ("DOT") regulations that bar release of the information at issue.

Defendants also contest the applicability of Exemption 7(F) and Exemption 4.  Yet again, Defendants' arguments here are new; they are not the reasons PHMSA asserted in its decision. Regardless, Sunoco has provided detailed factual and legal support to demonstrate that the risk consequence modeling data is subject to the protections of both exemptions.  PHMSA's disclosure decision impermissibly ignores those justifications, contradicts well-established authority, is based on an improper analysis of factors outside the scope of inquiry, and represents an unexplained reversal of its own precedent and prior determinations.  For all of these reasons, the Court should deny Defendants' Motion to Dismiss.

## ALLEGATIONS OF THE VERIFIED COMPLAINT

The confidential risk consequence modeling data at issue provides the specific distances from the pipeline at which individuals may be harmed by a pipeline rupture, including the distance

(in feet) that a pipeline rupture may be lethal or cause first or second-degree burns.  Compl. ¶¶ 22, 28.  The data also includes the lower flammability limit, which is the distance at which a mixture of gas or vapor released from a pipeline can ignite.  At PHMSA's request, Sunoco provided this information to PHMSA during a 2018 inspection of Sunoco's flow reversal/repurposing project on the ME2 interstate natural gas pipeline system in Pennsylvania.[3]  *Id.* ¶¶ 16-17.  The risk consequence modeling data was contained in two reports (the "Stantec Reports").[4]  The Stantec Reports were prepared for Sunoco by Stantec Consulting Ltd. ("Stantec") in order to comply with federal pipeline safety regulations that require pipeline operators with systems in densely populated areas (known as "high consequence areas" or "HCAs") to implement integrity management and public awareness measures.  *Id.* ¶¶ 18, 20.

Sunoco routinely shares information such as the Stantec Reports in a confidential manner with federal, state, and local emergency response agencies for preparedness purposes.  When it provided the Stantec Reports to PHMSA, Sunoco, in accordance with its standard practice, marked the reports as proprietary and confidential.  *Id.* ¶ 24. Sunoco also submitted each report with a cover letter conditioning its submission upon applicable confidentiality protections and exemptions under federal and state law.  *Id.* ¶ 25; Ex. D; Ex. E.[5]

Following its inspection of Sunoco's ME2 pipeline, PHMSA issued a Notice of Probable Violation ("NOPV") on May 15, 2019, alleging that Sunoco violated certain federal pipeline safety

---

[3] ME2 transports propane, ethane, butane and natural gasoline, which are all natural gas liquids. When released from a pipeline, natural gas liquids may form a highly flammable vapor cloud.

[4] The two reports are a March 27, 2017 report entitled "Hazard Assessment of the Proposed Mariner 2 East Pipeline" and an October 15, 2018 report entitled "Energy Transfer: Mariner East 2 Pipeline Re-Route near Chester and Delaware, Pennsylvania – Butane Spill Assessment: Final Report."  Compl. ¶ 17.

[5] Referenced exhibits are attached to Sunoco's Verified Complaint.

regulations.  Compl.  ¶ 27.  Although not necessary to support the underlying allegations, PHMSA quoted the specific results of the spill dispersion and thermal radiation analysis from the Stantec Reports in the NOPV and included the same information in an accompanying Pipeline Safety Violation Report ("PSVR").  *Id.* ¶ 28.

Upon receiving the NOPV, Sunoco immediately objected to the inclusion of Stantec's analysis and requested that PHMSA remove the risk consequence modeling data from the NOPV and the PSVR.  *Id.* ¶¶ 29-30.  Sunoco explained that, consistent with how it was labeled and submitted to PHMSA, the risk consequence modeling data was exempt from public disclosure under FOIA.  *Id.* ¶ 30; Ex. F.  Sunoco also provided PHMSA with suggested redactions limited to the specific distances modeled in the reports.  Compl. ¶ 30; Ex. F.  In response, PHMSA advised Sunoco on June 19, 2019 that it would not redact the data from the NOPV and that it intended to make the information publicly available.  Compl. ¶ 31.  To avoid the harm that disclosure may cause and to protect the confidential information, Sunoco objected to PHMSA's decision and provided additional support for its position that the data should be withheld from public disclosure. *Id.* ¶ 33; Ex. H.

Several months later, in November 2019, PHMSA requested that Sunoco provide further justification for the confidentiality of the information within five business days of its correspondence.  Compl. ¶ 34.  Again, Sunoco promptly provided a written justification for withholding the information under both FOIA Exemption 7(F) and Exemption 4.  *Id.* ¶ 35; Ex. J. With respect to Exemption 7(F), Sunoco explained that the quoted information from the Stantec Reports "would give anyone seeking to cause harm the ability to deduce the zones and populations that would be most impacted by a pipeline incident."  Compl., Ex. J at 3.  In support, Sunoco relied on a report by the United States Government Accountability Office ("GAO") and an affidavit by

the then-Manager of the Safety Division, Pipeline Safety Section of the Pennsylvania Public Utilities Commission ("PA PUC"), Paul Metro, which recognized the confidential nature of the same information and that pipelines "have been and continue to be targeted by terrorists and other malicious groups globally." *Id.* at 3-4.  With respect to Exemption 4, Sunoco explained that it had a commercial interest in the risk consequence modeling data and that it customarily maintained the information as confidential. *Id.* at 5.  On November 26, 2019, PHMSA, in apparent agreement with Sunoco's justification, agreed to post a redacted copy of the NOPV on its FOIA Electronic Reading Room.  Compl. ¶ 37; Ex. K.

In December 2019, PHMSA received two FOIA requests seeking unredacted copies of the NOPV.  Compl. ¶ 38.  Despite its earlier decision to redact the information, and the extensive information Sunoco had already provided, PHMSA requested that Sunoco provide further support for redacting the results of the risk consequence modeling data from the NOPV. *Id.* ¶ 39.  To ensure that the information remained confidential, Sunoco provided another justification supporting the redaction of targeted information from the NOPV on January 7, 2020. *Id.* ¶ 40; Ex. M.

On September 30, 2020, PHMSA denied the FOIA requests, concluding that the risk consequence modeling data was exempt from disclosure under FOIA Exemption 4 because the redacted data was confidential commercial information.  Compl. ¶ 42; Ex. N; Ex. O; Ex. T at 3.  PHMSA did not, however, address Exemption 7(F).  Compl., Ex. N; Ex. O.

On November 12, 2020, one of the FOIA requesters appealed PHMSA's denial of his request.  Compl., Ex. P at 1.  In his appeal, the requester expressly recognized the potential harm to the public from disclosure of the redacted data. *Id.* (stating that "the subject information concerns how many members of the public would be impacted (i.e. harmed) by an incendiary

explosion").  In response to the appeal, PHMSA requested that Sunoco provide further support for its position that the information should be withheld from public disclosure.  Compl. ¶ 43; Ex. Q. Sunoco responded on December 18, 2020 by pointing out that outside agencies and courts have recognized that the release of information similar to the risk consequence modeling data might incentivize sabotage, damage, or harm to the pipeline. Compl., Ex. R. at 2.  Sunoco also explained that release of the information would likely cause harm to Sunoco's commercial interests because the information could be used to sabotage or otherwise damage the pipeline or used by third parties to delay or interfere with the necessary regulatory approvals that are required to operate the pipeline.  *Id.* at 3.  PHMSA did not reply to this correspondence until June 24, 2021—more than six months later and more than two years after the issue arose—when it issued, without notice, its final decision, reversing course and indicating that it planned to publicly release an unredacted copy of the NOPV one week later, on July 2, 2021 ("Final Determination").  Compl. ¶ 45; Ex. T.

PHMSA's decision to release the results of the risk consequence modeling cited in the NOPV—including the specific distances at which individuals near the pipelines may be harmed from a pipeline rupture and the extent of that harm—directly contradicts the PA PUC's decision to withhold the same data.  Compl. ¶ 23; Ex. B.  The PA PUC, which has authority to inspect and regulate Sunoco's ME2 pipeline, has consistently rejected requests to release the Stantec Reports under Pennsylvania's Right-to-Know laws.  Compl. ¶ 23.  The PA PUC has concluded that "there are reasonable grounds to believe [that] disclosure [of the risk consequence modeling data] may result in a safety risk, including the risk of harm to any person, or mass destruction" and "non-

disclosure is necessary for the protection of life, safety, public property or public utility facilities." Compl., Ex. C at 2.[6]

Without addressing the PA PUC's analysis, and in an unexplained reversal of its prior determinations, PHMSA found in its Final Determination that FOIA Exemptions 4 and 7(F) did not apply to the risk consequence modeling data. Compl. ¶¶ 45-47; Ex. T. With respect to Exemption 7(F), PHMSA failed to address any of the information Sunoco provided about the potential risk to the pipeline and surrounding communities from disclosure of the risk consequence modeling data. Compl., Ex. T at 8. Instead, without any supporting evidence, PHMSA speculated that disclosure of the information might "educate the public on possible hazards from an unintended release of propane and butane." *Id.* PHMSA also stated, without any explanation or factual or legal support, that, even if Exemption 7(F) applied, it would exercise its discretion to release the information to the public because "any harm attributable to release of this type of information is considerably outweighed by the benefit to the public at-large from being able to better plan emergency response." *Id.*

Separately, PHMSA concluded that the risk consequence modeling data was neither commercial nor confidential under Exemption 4. Compl. ¶ 46. With little explanation and based on a single unreported district court decision from 1998, PHMSA stated that the data was not "commercial in nature because it is factual information developed for emergency response and 'does not contain any in-depth analysis of the [business] in dealing with these incidents.'" Compl., Ex. T at 4 (citations omitted). In addition, PHMSA stated that "these numerical values or numbers relate to the well-known physical properties of natural gas liquids . . . and the known safety

---

[6] The PA PUC's decision to withhold the information is currently on appeal to the Pennsylvania Supreme Court, with oral argument set for October 26, 2021. Compl. ¶ 23.

concerns that come from moving highly volatile liquid." *Id.* Since the development of the information was "specifically driven by safety-related compliance obligations," PHMSA incorrectly concluded that the information could not be considered "commercial" under FOIA Exemption 4.[7] *Id.*

To protect this highly confidential information from disclosure, Sunoco initiated this reverse-FOIA action seeking review of the Agency's arbitrary decision to publicly release the risk consequence data. In response, Defendants filed a Motion to Dismiss, arguing that Sunoco has failed to allege a plausible claim under the APA. Defendants first contend that Sunoco's claim fails because Sunoco has failed to allege that some law other than FOIA prohibits disclosure. Mem. of Law in Supp. of Defs.' Mot. to Dismiss (ECF 12-1) ("Mot. to Dismiss") at 4-7. Defendants also dispute that the information at issue is subject to Exemptions 4 and 7(F). *Id.* at 7-12. Neither argument warrants dismissal.

## STANDARD OF REVIEW

### A.   Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim . . . that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). A claim is facially plausible when the allegations in the complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a complaint under this standard, the court must "construe a complaint liberally in the plaintiff's favor." *Citizens for Resp. & Ethics in*

---

[7] In its Final Determination, PHMSA also concluded that the risk consequence modeling data was not confidential. Although the Complaint alleges that this finding was incorrect, Compl. ¶¶ 45-46, Defendants do not move to dismiss on the grounds that the information is not confidential. As a result, this brief does not address the confidential nature of the risk consequence modeling data.

*Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 358 (D.D.C. 2020) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  That is, the court must treat the plaintiff's "factual allegations as true and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation and quotation omitted).

### B. Reverse-FOIA Actions and the Administrative Procedure Act

This Court has recognized that "[a] person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it." *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F. Supp. 2d 80, 84 (D.D.C. 2010) (internal citation omitted).  In a reverse-FOIA action, "the Court reviews the agency's decision to release information under the Administrative Procedure Act." *AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 41-42 (D.D.C. 2015).  This analysis requires the Court to determine whether an agency's decision to release the information is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

When conducting this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, this requires that the agency "considered relevant data and articulated an explanation establishing a 'rational connection between the facts found and the choice made.'" *Nat'l Bus. Aviation Ass'n, Inc.*, 686 F. Supp. 2d at 84 (quoting *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986)).  An agency's decision may be arbitrary and capricious if the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under this standard of review, courts are "not to substitute [their] judgment for that of the agency." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Courts, however, should "not defer to the agency's conclusory or unsupported suppositions," or rely on "any *post hoc* rationales an agency provides for its decision." *Gen. Elec. Co. v. Dep't of the Air Force*, 648 F. Supp. 2d 95, 100 (D.D.C. 2009) (internal quotations omitted).

## ARGUMENT

## I.    THE COURT'S REVIEW IS LIMITED TO THE GROUNDS INVOKED IN PHMSA'S FINAL DETERMINATION

It is a "simple but fundamental rule of administrative law" that a "reviewing court . . . must judge the propriety of [an agency's] action solely on the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019) (recognizing *Chenery* as "longstanding Supreme Court precedent"). If a court finds that "those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery Corp.*, 332 U.S. at 196. Just as a court cannot rely on its own reasoning to support an agency's final decision, the court must also "not accept . . . counsel's *post hoc* rationalizations for [the] agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). That is, a court's review of an agency's action under the APA must rise and fall on the grounds invoked by the agency when making its final decision. *See also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Defendants violate this basic principle of administrative law.  Throughout their motion, Defendants go beyond the rationale in PHMSA's Final Determination in an improper attempt to bolster PHMSA's flawed decision and expand the scope of the Court's review.  For example, Defendants assert that PHMSA has discretion to release information under FOIA, including pursuant to Exemption 4.  Mot. to Dismiss at 4-6.  PHMSA, however, does not claim or rely on agency discretion as a basis to deny Sunoco's request for withholding under Exemption 4.  *See* Compl., Ex. T at 4-7.  Instead, PHMSA conspicuously and deliberately invoked its discretion as a means for overriding *only* Exemption 7(F).  *See id.* at 1-2, 8 ("PHMSA would make a discretionary release *even if Exemption 7 applied*.") (emphasis added).  As a result, PHMSA's decision must be judged solely on the merits of its decision not to apply Exemption 4 at all.

Defendants likewise rely solely on an argument that PHMSA never made when finding that the information should not be withheld from disclosure under Exemption 7(F).  In fact, Defendants do not even reference, much less defend, PHMSA's rationale regarding Exemption 7(F).  In the Final Determination, PHMSA only addressed the applicability of FOIA Exemption 7(F) in two short paragraphs.  Compl., Ex. T at 8.  PHMSA concluded that the risk consequence modeling data could "reasonably be expected to educate the public on the possible hazards associate with an unintended release" and that this benefit outweighed any harm from release of the data.  *Id.*  In their Motion to Dismiss, Defendants abandon PHMSA's rationale and assert an entirely different grounds for release of the data.  Specifically, Defendants argue that the data does not provide a specific geographical location along the pipeline and so cannot reasonably be used by a terrorist or criminal to harm the pipeline or the surrounding communities.  Mot. to Dismiss at 8.  In support of this argument, though, Defendants cite only to the portions of PHMSA's Final Determination that address Exemption 4.  *Id.* (citing to Compl., Ex. T at 4-6).  Because PHMSA

did not cite these grounds in its Final Determination relating to Exemption 7(F), Defendants cannot rely on it now. *See, e.g.*, *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 92 (D.D.C. 2019) (rejecting the government's attempt to rely on a bases that was not offered by the agency, noting that the "court cannot fill in critical gaps in the agency's reasoning"). Rather, the Court must limit its review to the reasons identified by PHMSA in its Final Determination.

## II.    THE TRADE SECRETS ACT AND APPLICABLE DOT REGULATIONS PRECLUDE DISCLOSURE OF THE RISK CONSEQUENCE MODELING DATA

Defendants contend that Sunoco must allege something more than a misapplication of Exemptions 4 and 7(F) to state an APA claim. Mot. to Dismiss at 4-6. Since FOIA exemptions do not require an agency to withhold information, Defendants argue, PHMSA can exercise its discretion to disclose the risk consequence modeling data. *Id.* As stated above, this argument goes beyond the grounds for PHMSA's decision because PHMSA did not rely on its discretion with regard to Exemption 4. *See* Section I, *supra*. It also ignores that the Trade Secrets Act, 18 U.S.C. § 1905, prohibits PHMSA from disclosing information that falls within Exemption 4 and that DOT regulations bar the disclosure of information which falls within any FOIA exemption.

### A.    The Trade Secrets Act Bars PHMSA from Releasing Information Subject to Exemption 4

It should come as no surprise that PHMSA did not assert that it had the discretion to disregard Exemption 4. *See* Compl., Ex. T. The Supreme Court has long recognized that the Trade Secrets Act "place[s] substantive limits on agency action," particularly in the context of Exemption 4, and any disclosure beyond its limits is "reviewable agency action" under the APA. *Chrysler Corp.*, 441 U.S. at 291, 317-18. As the D.C. Circuit has held, "[t]he language of the [Trade Secrets] Act is exceedingly broad" and "appears to cover *practically any commercial* or financial data collected by any federal employee from any source in performance of the duties of his or her employment." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1140 (D.C. Cir. 1987) (emphasis

added).  Thus, "the scope of the Act is at least co-extensive with that of Exemption 4 of FOIA," *id.* at 1151, and "when a person can show that information falls within Exemption 4, then the government is precluded from releasing it under the Trade Secrets Act," *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 305 (D.C. Cir. 1999); *accord Canadian Com. Corp. v. Dep't of the Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008) ("[U]nless another statute or a regulation authorizes disclosure of the information, the Trade Secrets Act requires each agency to withhold any information it may withhold under Exemption 4 of the FOIA."); *Northrop Grumman Sys. Corp. v. NASA*, 346 F. Supp. 3d 109, 116-17 (D.D.C. 2018).

Granting Sunoco the benefit of all favorable inferences, *Sparrow*, 216 F.3d at 1113, the Complaint plausibly alleges that the risk consequence modeling data falls within Exemption 4, and so its release is barred by the Trade Secrets Act.  Sunoco alleges that it requested that Stantec perform its risk consequence modeling in the course of its commercial operations and to support Sunoco's commercial interest in maintaining the operation of its pipeline.  Compl. ¶¶ 52, 61-64. In addition, if this confidential data was revealed, it could provide a blueprint for a third party attempting to disrupt the operation of the pipeline, harming Sunoco's commercial interest in the safe transportation of products.  *Id.* ¶¶ 53-56, 64; *see also infra* Section IV.B.  These allegations are sufficient to show that the risk consequence modeling data falls within Exemption 4 and that its release is prohibited by the Trade Secrets Act.  *McDonnell Douglas Corp.*, 180 F.3d at 305. That prohibition can sustain APA review on its own, *Chrysler Corp.*, 441 U.S. at 317-18, so the Motion to Dismiss must be denied.

To avoid this result, Defendants assert that Sunoco has not alleged that the data is independently a "trade secret."  Mot. to Dismiss at 6.  This argument ignores that the Trade Secrets Act covers all aspects of Exemption 4, *CNA Fin. Corp.*, 830 F.2d at 1140, thus protecting not only

trade secrets" but also other "commercial" information."  5 U.S.C. 552(b)(4).  Indeed, this Court has sustained a reverse-FOIA claim where all sides acknowledged that the information was not a trade secret, though it was exempt confidential commercial information.  *See Mallinckrodt v. West*, 140 F. Supp. 2d 1, 4 (D.D.C. 2000).  Nor must pleadings explicitly cite the Trade Secrets Act; Rule 8 turns not on the legal conclusions of the complaint but on the plausible violations that may be *inferred* from alleged facts.  *Iqbal*, 556 U.S. at 678-79.  The applicability of Exemption 4 is all that is needed to invoke the Trade Secrets Act as a hard limit on agency discretion.

## B. DOT Regulations Bar PHMSA from Releasing Information Subject to Any FOIA Exemption

In addition, disclosure is not committed to agency discretion when the agency's own rules constrain that discretion.  *See Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1185 (8th Cir. 2000) ("USDA's discretion to release FOIA-exempt information is governed by a USDA regulation[.]"); *see also Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 54 (D.C. Cir. 1981); *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, No. 16-cv-720 (TJK), 2021 WL 4739036, at *2 (D.D.C. Oct. 12, 2021).  The Complaint alleges a violation of just that type of constraint.  *See* Compl. ¶¶ 15, 51, 61.  DOT has promulgated FOIA rules applicable to each of its component agencies, including PHMSA.  *See* 49 C.F.R. § 7.2 (defining the "Department" or "DOT" as each of its individual operating administrations).   One such rule, Section 7.23, is titled, "What limitations apply to disclosure?"—clearly indicating that the regulation is intended to constrain disclosure.  49 C.F.R. § 7.23; *see INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (using the title of a statutory section to construe its terms); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959) (same).  Paragraph (b) of that rule presents a straightforward rule as to when PHMSA may disclose information under FOIA:

> As provided in 5 U.S.C. 552(a)(3)(A), DOT makes reasonably described records available upon request from a member of the public, when the request is submitted

in accordance with this subpart, *except to the extent that the records contain information exempt from FOIA's mandate of disclosure as provided in 5 U.S.C. 552(b)*.

49 C.F.R. § 7.23(b) (emphasis added).[8]

The language of § 7.23(b) is clear: the agency will release properly requested information, *except* when one of the exemptions in § 552(b) applies. In that case, the information is "exempt from FOIA's mandate of disclosure." To interpret it otherwise ignores the plain meaning of the "except" clause and would render that clause meaningless. *See, e.g.*, *Zhang v. U.S. Citizen & Imm. Servs.*, 978 F.3d 1314, 1322 (D.C. Cir. 2020). Notably, DOT added this exception to paragraph (b) at the same time that it also re-titled the rule as "limitations" on disclosure. *Compare* 49 C.F.R. § 7.23(b), *with* 49 C.F.R. § 7.13(b) (2013); *see also* Final Rule, *Public Availability of Information*, 79 Fed. Reg. 16,207, 162,11 (Mar. 25, 2014). Thus, PHMSA "has chosen to be guided by the policy of FOIA in exercising its discretion to disclose: the applicable regulations provide that [PHMSA] will treat as confidential, and thus refrain from disclosing, all information that is exempt under Exemption 4" or any other exemption.[9] *Worthington Compressors, Inc.*, 662 F.2d at 54.

---

[8] In fact, Section 7.23(b) restricts agency discretion to disclose exempt information even more than the regulations at issue in *Glickman* or *Worthington Compressors*. In *Glickman*, a USDA regulation authorized disclosure of information covered by a FOIA exemption if it was in the public interest. *Glickman*, 200 F.3d at 1185. Section 7.23(b), on the other hand, prohibits disclosure whenever an exemption applies, and so does not allow balancing of non-disclosure with the public interest. Similarly, the EPA regulation in *Worthington Compressors*, unlike § 7.23(b), included an exception to non-disclosure in exceptional circumstances. *Worthington Compressors*, 662 F.2d at 51.

[9] Under DOT regulations, a record shall be withheld only if the agency also "reasonably foresees that disclosure would harm an interest protected" by an exemption. 49 C.F.R. § 7.23(d)(1). This requirement derives from FOIA itself, 5 U.S.C. § 552(a)(8)(A)(i)(I), and is easily met. Disclosing confidential commercial information foreseeably harms commercial interests protected by Exemption 4, *see infra* Section IV.B, and disclosing records whose information "could reasonably be expected to endanger the life or physical safety of any individual" foreseeably harms the interests of public safety that underlie Exemption 7(F), 5 U.S.C. § 552(b)(7)(F). As long as foreseeable harm exists, DOT agencies must still withhold exempt information. 49 C.F.R. § 7.23(b).

Sunoco relied on § 7.23(b) in its justifications that the risk consequence modeling data should be withheld from disclosure, *see* Compl., Ex. J at 3, but PHMSA failed to address this argument in its Final Determination, *see* Compl., Ex. T at 8.  As a result, PHMSA "entirely failed to consider an important aspect of the problem"—a classic APA violation.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Now, Defendants claim that § 7.23(b) is merely "permissive."  Mot. to Dismiss at 6-7.  But *Chenery* bars any new interpretation not found in an agency's underlying decision.  *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012) ("Although the U.S. Attorney's Office, defending the Postal Service, has offered an interpretation of at least two of the three disputed sections of the Act, we are not willing to accept those as authoritative Postal Service statutory interpretations; that would be quite inconsistent with *Chenery's* teaching.").  PHMSA offered no legal analysis supporting its discretion whatsoever, precluding any such analysis now.  *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1011 (D.C. Cir. 1999) (*Chenery* precludes development of interpretative justification where agency "has provided none").

Defendants' new analysis is flawed in any event.  To read withholding as permissive, Defendants point to DOT's general policy in § 7.23(a).  Mot. to Dismiss at 7.  But that high-level policy applies only to "meaningful *nonexempt* information in a document from which *exempt information is withheld*."  49 C.F.R. § 7.23(a) (emphasis added).  The exemptions are as much a part of FOIA's purposes and policies as its disclosure requirement.  *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).  Withholding exempt documents is fully consistent with the "spirit of FOIA."  49 C.F.R. § 7.23(a).

Nor can Defendants now rely on a separate PHMSA regulation, 49 C.F.R. § 190.343, describing the submitter consultation process.  *See* Mot. to Dismiss at 6.  Again, no explanation of this rule as a grant of discretion can be found in the Final Determination.  *See* Compl., Ex. T.

Moreover, § 190.343 explains only what PHMSA will do if it decides that certain information does *not* fall under Exemption 4; it says nothing about what PHMSA may or may not do if that information is exempt.  *See generally* 49 C.F.R. § 190.343.

## III.   SUNOCO SUFFICIENTLY ALLEGES THAT THE RISK CONSEQUENCE MODELING DATA FALLS WITHIN EXEMPTION 7(F)

### A.   Defendants' Motion to Dismiss Relies on Grounds Outside of the Final Determination

As stated in Section I, *supra*, the Motion to Dismiss attempts to justify PHMSA's decision with respect to Exemption 7(F) on a *new* basis—that the information is not specific enough to create any risk of harm.  Mot. to Dismiss at 11-12.  PHMSA's analysis of Exemption 7(F), however, makes no mention of the purported general nature of the risk consequence modeling data.  As a result, the Court cannot consider this basis when determining whether PHMSA's Final Determination violates the APA.

### B.   Sunoco Has Adequately Alleged that FOIA Exemption 7(F) Applies

To fall within Exemption 7(F), a party must "show (1) that the information was 'compiled for law enforcement purposes' . . . and (2) that production of these materials 'could reasonably be expected to endanger the life or physical safety of any individual.'"  *Greenpeace, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 110, 127 (D.D.C. 2018) (quoting 5 U.S.C. § 552(b)(7)).  With respect to critical infrastructure, like pipelines, the D.C. Circuit has held that parties "will ordinarily be able to satisfy Exemption 7(F) for documents relating to critical infrastructure, such as blueprints, maps, and emergency plans."  *Pub. Emps. for Env't Resp. v. U.S. Sec., Int'l Boundary & Water Comm'n*, 740 F.3d 195, 206 (D.C. Cir. 2014) (hereinafter "*PEER*").

The risk consequence modeling data falls squarely within the exemption.  PHMSA requested the Stantec Reports while exercising its authority to enforce federal pipeline safety

regulations.[10]  *See Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 849 F. Supp. 2d 13, 27 (D.C. Cir. 2012) ("Exemption 7 is thus triggered when the files sought relate to anything that can fairly be characterized as an enforcement proceeding.") (internal quotation omitted).  In addition, disclosure of the risk consequence modeling data endangers those living within the immediate vicinity of the ME2 pipeline by enabling bad actors to identify points at which an attack would cause greatest harm.  *See* Compl. ¶¶ 1, 3, 5, 21-23, 53-56, 64-65, 67; *see also* Compl., Ex. B at 2; Ex. C at 2-3; Ex. J at 3-4; Ex. M.  That knowledge foreseeably increases the incentive for such an attack.  Compl. ¶ 56; Ex. C ¶ 10.  This risk is apparent from use of such results to comply with PHMSA regulations on "high consequence areas" and their traditional redaction in Facility Response Plans.  Compl. ¶ 20; Ex A at 2.  In fact, one requester sought the redacted information precisely because it "concerns how many members of the public would be impacted . . . by an incendiary explosion."  Compl., Ex. P at 1.  If the redacted data would allow the requesters to gauge where and how harm might occur, it would allow assailants to do the same.[11]

Defendants deny this risk because the results apply along the entire pipeline.  Mot. to Dismiss at 11-12.  These denials read the Complaint too narrowly and dispute the veracity of its allegations, *id.* at 11 (citing Compl. ¶¶ 1, 22, 65)—the very opposite of the Rule 12 standard.

---

[10] In its Final Determination, PHMSA does not contest that it obtained the risk consequence modeling data while performing a law enforcement function or otherwise contest that the records were "complied for law enforcement purposes."  *See* Compl., Ex. T at 8.

[11] Other correspondence in the record reinforces the safety implications of the redacted data.  After Defendants moved to dismiss this suit, Sunoco obtained emails between the requesters and PHMSA through its own FOIA requests.  In these emails, the requesters stressed that disclosure was needed in order "to disseminate time-critical information to the public regarding risks associated with Sunoco current and proposed operations," and to evaluate "imminent threat to life and property."  Ex. 1 at 1, 2, 5.  These documents—and perhaps others contradicting PHMSA's rationale—should have been disclosed when Defendants filed an administrative record alongside their motion.  Defendants' decision to withhold the full record prejudices Sunoco's ability to determine whether and how to amend its Complaint in response to Defendants' motion.  The Court should therefore deny the motion for failure to comply with Local Rule 7(n).

*Sparrow*, 216 F.3d at 1113.  These denials are also wrong:  Although the data included in the NOPV is applicable to the entire pipeline, it provides the "specific" zones (down to distance in feet) and exact populations where a pipeline rupture would cause the greatest impact at any point along the pipeline route, including the extent of casualty and damage at various ranges.  *See e.g.*, Compl. ¶¶ 1, 22; Ex. J at 3-4.  "[J]udicial experience and common sense" alone suggest that a terrorist or criminal could use the redacted data, in conjunction with the location of the pipeline, to plan an attack that causes the greatest possible harm to the communities living along the pipeline.  *Iqbal*, 556 at 679; *see* Compl., Ex. S at 1 (seeking the data for a populated area).  Given the specific nature of the data and the potential for the nefarious use of it by persons wishing to harm the pipeline or the surrounding communities, Sunoco has sufficiently alleged that the information falls within the parameters of FOIA Exemption 7(F).[12]

---

[12] Exemption 7(F) does not require a showing that disclosure will definitely result in harm to the public.  *See PEER*, 740 F.3d at 206 ("Disclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices.") (emphasis in original).  In any event, pipelines have been subject to both physical and cyberattacks, and the GAO has expressly recognized the pipelines are particularly vulnerable to physical attacks:

> According to [the Transportation Security Administration within the Department of Homeland Security], pipelines are vulnerable to physical attacks—including the use of firearms or explosives—largely due to their stationary nature, the volatility of transported products, and the dispersed nature of   pipeline networks spanning urban and outlying areas. The nature of the transported commodity and the potential effect of an attack on national security, commerce, and public health make some pipelines and their assets more attractive targets for attack. Oil and gas pipelines have been and continue to be targeted by terrorists and other malicious groups.

U.S. Gov't Accountability Off., GAO-19-48, *Critical Infrastructure Protection Actions Needed to Address Significant Weaknesses in TSA's Pipeline Security Program Management*, pp. 10-11 (Dec. 2018) (emphasis added), available at https://www.gao.gov/assets/700/696123.pdf.

### C.     PHMSA's Balancing of the Risks and Benefits of Disclosure is Clear Error

PHMSA's reliance on the purported benefits from disclosure misapplies the law. Exemption 7(F) contains no exception for information which may have potential benefits. Information can both be useful for emergency planning purposes and present a risk to the public if utilized by third party bad actors.  *See, e.g.*, *PEER,* 740 F.3d at 204-06 (finding that inundation maps could support emergency planning functions while still being subject to Exemption 7(F)). By its plain terms, the exemption applies to any information which "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  The existence of a potential benefit from disclosure has no role in this analysis.

Consistent with the language of the exemption, this Court has routinely held that it is improper for agencies to balance the potential risk and benefits of disclosure when applying Exemption 7(F).  *See, e.g.*, *Sluss v. U.S. Dep't of Just.*, No. 1:17-CV-00064, 2019 WL 2493447, at *7 (D.D.C. June 14, 2019) ("Exemption 7(F) involves no balancing test[.]"); *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 368 (D.D.C. 2017) ("Unlike Exemption 7(C), which involves a balancing test, Exemption 7(F) is an absolute ban against [disclosure of] certain information."). Thus, this Court has expressly rejected the balancing of the risks and benefits of disclosure. *Greenpeace*, 311 F. Supp. 3d at 115.  In *Greenpeace*, the plaintiff argued that the risk of releasing information about certain facilities and the chemicals in their possession "are minor and outweighed by the benefits of taking such action."  *Id.* at 130.  The Court flatly rejected that argument, holding that Exemption 7(F) is "not a 'balancing test' that requires the agency to weigh that danger against possible benefits of releasing the information."  *Id.*  PHMSA's Final Determination relies on the same fallacy.  The sole inquiry under Exemption 7(F) is whether the

information could reasonably be expected to endanger the lives of others—an inquiry that PHMSA wholly ignored.[13]

PHMSA's determination is also contrary to well-established authority, including its own precedent.  As stated above, GAO has expressly recognized that pipelines are vulnerable to attack from terrorists and criminals.  *Supra* note 12 (stating that "[o]il and gas pipelines have been and continue to be targeted by terrorists and other malicious group").  Likewise, PHMSA redacts "Worse Case Discharge" information similar to risk consequence data from Facility Response Plans.  Compl., Ex. A at 2.  In its Final Determination, PHMSA failed to explain how the risk consequence modeling data, which shows the worst-case impacts of a potential pipeline rupture, is distinguishable from the discharge information redacted from Facility Response Plans or why it chose to break from its standard practice of redacting such information.  *See* Compl., Ex. T.  Moreover, this Court and other district courts have also applied Exemption 7(F) to nearly identical information.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F Supp. 3d 516, 522-23 (D.D.C. 2017) (finding that "spill modeling discussions," including "maps of spill scenarios and predictions as to the volume of oil that would be released," are subject to FOIA Exemption 7(F)); *see also Living Rivers v. U.S. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1321-22 (D. Utah 2003) (finding that maps that showed information such as "estimated travel times for the flood progression at key locations" as well as "the extent of flooding that would be

---

[13] Even if PHMSA were permitted to balance the potential benefit of releasing the information with the risk that the public will be endangered—which it is not—PHMSA's Final Determination ignores that Sunoco already provides emergency response planning information to the public and local emergency responders.  Pursuant to the federal pipeline safety regulations, Sunoco maintains a robust public awareness program designed to "educate the public" on the "[s]teps that should be taken for public safety in the event of a . . . release."  49 C.F.R. § 195.440.  Releasing the risk consequence data to the public will not provide meaningful additional information for emergency planning purposes and will only put the public at a greater risk of harm.

occasioned by attacking individual features of the dam" should be withheld from public disclosure under FOIA Exemption 7(F)).[14]

In *PEER*, the D.C. Circuit held that Exemption 7(F) applied to inundation maps which displayed the downstream areas and populations affected by a potential dam failure.  740 F.3d at 205-06.  In a holding that is also applicable to the risk consequence modeling data, the Court stated that "[t]errorists or criminals could use that information to determine whether attacking a dam would be worthwhile, which dam would provide the most attractive target, and what the likely effect of a dam break would be."  *Id.* at 206.  Just as spill modeling shows the zone of inundation from a potential dam failure, the risk consequence modeling data shows the areas of potential harm from a pipeline rupture.  As in *PEER*, a terrorist or criminal could use the risk consequence modeling data to determine whether attacking a pipeline would be worthwhile, which pipeline would provide the most attractive target, and the likely impact of a rupture at any point along the pipeline.  PHMSA did not attempt to distinguish *PEER* or provide any other support for its decision to dismiss the risks associated with releasing this information.

Finally, PHMSA's decision fails to consider and directly contradicts the PA PUC's decision that the *same* information should be withheld based on the potential harm to the community.  As stated above, the PA PUC has consistently rejected public requests for the risk consequence modeling data and has held that disclosure of this information "creates a reasonable likelihood of endangering the safety or the physical security of a . . .  public utility, resource,

---

[14] Defendants rely on cases where courts have held that inundation maps should be protected from public disclosure in an attempt to argue that the risk consequence modeling data is not specific enough to warrant protection under Exemption 7(F).  Mot. to Dismiss at 11-12 (citing *PEER*, 740 F.3d at 206 and *Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1321 (D. Utah 2003)).  The information in those cases is indistinguishable from the risk consequence modeling data; the length of the pipeline does not alter that the data can be used to harm the communities living near the pipeline.

infrastructure, or facility, including infrastructure records that expose or create a vulnerability through disclosure." Compl., Ex. B at 2 (internal quotations omitted). In an affidavit to support the PA PUC's decision, Paul Metro, then-Manager of the Safety Division, Pipeline Safety Section of the PA PUC, stated "[i]n my professional opinion, disclosure of the requested records would compromise security against sabotage or criminal or terrorist acts, and non-disclosure is necessary for the protection of life, safety, public property or public utility facilities." Compl., Ex. C at 2. Mr. Metro also stated:

> release of the requested records would compromise security against sabotage or criminal or terroristic acts regarding pipeline facilities by illustrating the extent of the impact zone, including casualty and damage assessments at various ranges, regarding an accident (or sabotage event) on a pipeline. These Reports and Inspection Reports explicitly provides how such an assessment can be made (as well as the assessment for this particular pipeline); information which could clearly be used by a terrorist to plan an attack a (sic) pipeline (and particularly on these Sunoco pipelines, as they contains (sic) the specific operating parameters of the pipelines) to cause the greatest possible harm and mass destruction to the public living near such facilities.

*Id.* PHMSA, however, failed to address Mr. Metro's findings or even mention the PA PUC, much less explain its basis for reaching a contradictory conclusion.

For the reasons described above, PHMSA's decision that the risk consequence modeling data is not subject to the protections of Exemption 7(F) is based on a "clear error of judgment" and a failure to consider relevant factors critical to this issue. *Marsh*, 490 U.S. at 378; *see also Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (recognizing that an agency's decision is arbitrary if the agency "has relied on factors which Congress has not intended it to consider" or "offered an explanation for its decision that runs counter to the evidence before the agency"). As required at this stage in the proceedings, Sunoco has sufficiently alleged that PHMSA's Final Determination violates the APA and, as a result, the Court must deny Defendants' Motion to Dismiss.

## IV.    SUNOCO SUFFICIENTLY ALLEGES THAT THE RISK CONSEQUENCE MODELING DATA IS COMMERCIAL INFORMATION UNDER EXEMPTION 4

Exemption 4 bars disclosure of information where three elements are met: (1) commercial or financial information; (2) obtained from a person; that is (3) privileged or confidential.  *E.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 62 (D.D.C. 2015) ("*EPIC*").  Defendants contest only the first element.  Mot. to Dismiss at 7-11.

### A.    Defendants Misstate the Scope of "Commercial Information" under FOIA.

"Courts in this circuit have adopted a broad understanding of what information" qualifies as "commercial" for purposes of Exemption 4.  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, No. 19-cv-3626, 2021 WL 4502039, at \*4 (D.D.C. Sept. 30, 2021) ("*CREW*").  Information may be either commercial (1) "by its nature," in that it was "created . . . in connection with a commercial enterprise," or (2) "in its function," because the submitter has "a commercial interest at stake in its disclosure."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002).  Under the first test, commercial nature, the Court asks if the information "'reveal[s] basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate[s] to the income-producing aspects of a business.'"  *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 134 (D.D.C. 2017) (quoting *Pub. Citizen Health Rsch. Grp. v FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  Under the second test, for commercial function, the Court looks for a "commercial interest" by asking whether the submitter's "'commercial fortunes'" could be "'materially affected'" by disclosure.  *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 728, 281 (D.C. Cir. 1987), *vacated on other grounds* 975 F.2d 871 (D.C. Cir. 1992)).  In other words, the Court looks to the consequences of disclosure.  *Besson v. U.S. Dep't of Com.*, 480 F. Supp. 3d 105, 113 (D.D.C. 2020).  Those consequences depend on the context in which the

information will be disclosed.  *CREW*, 2021 WL 4502039, at *4; *see, e.g.*, *EPIC*, 117 F. Supp. 3d at 62-63 (finding that a submitter's identity might carry commercial consequences based on the "context in which the issue arises").

For safety risks, this Circuit has identified at least two pathways in which disclosure might materially affect a submitter's commercial fortunes.  First, disclosure of safety risks can impair commercial prospects by exacerbating those risks.  *See Critical Mass Energy Project*, 830 F.2d at 280 (holding that release of "safety-related event[s]" at nuclear power plants could materially affect their profitability in multiple ways); *see also EPIC*, 117 F. Supp. 3d at 52-53, 62-63 (finding that identities of participants in cybersecurity pilot program to identify threats to critical infrastructure carried commercial consequences).[15]  Similarly, disclosure of closely held information might subject the submitter to heightened "harassment" or "threats" that have commercial consequences.  *CREW*, 2021 WL 4502039, at *4.  Second, disclosure of "the health and safety experience" with a company's products might prove "instrumental" to "marketing approval of th[ose] products," including approval by regulators.  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1282-83, 1290 (finding that data on "adverse reactions and complications" associated with certain medical devices, submitted to the FDA "as part of the agency's investigation" into those devices might imperil approval of those products, even though the data did not "reveal basic commercial operations").

Defendants attempt to collapse the analytical distinction between the commercial-nature and commercial-function tests.  Although they briefly nod to the possibility of a "commercial

---

[15] In *EPIC*, the government defendant successfully invoked Exemption 4 by pointing to the possibility of "increased cyber targeting" and "admission of cyber vulnerability" as likely commercial consequences.  *See* Def.'s Mem. in Supp. of Mot. for Sum. J., No. 1:12-cv-333, 2013 WL 11305170, at 24 (Aug. 30, 2013).

interest," Mot. to Dismiss at 8, Defendants insist that commercial information must "'reveal[ ] . . . the company's internal operations or income-producing activities,' " *id.* at 9 (quoting *N.Y. Times Co. v. FDA*, No. 19-CF-4740(VEC), 2021 WL 1178126, at *9 (S.D.N.Y. Mar. 29, 2021). Defendants then repeat this view through the rest of their argument.  *See id.* at 9 (arguing that the reports in *Critical Mass Energy Project* were commercial because they "*describ[ed] the operations*" of the power plants); *id.* at 10 (information not commercial "if it is divorced from basic commercial operations that relate to the income-producing aspects of . . . the business") (internal quotation omitted)).  This is nothing more than an extended argument that the information must be commercial *in nature*.'" *Id.* at 10 (emphasis added) (quoting *Chi. Tribune Co.*, 1998 WL 242611, at *3).

Defendants' conclusion, however, is exactly what the D.C. Circuit rejected in adopting the commercial-function test: "Exemption 4 is *not* confined only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'" *Baker & Hostetler LLP*, 473 F.3d at 319 (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290). Elsewhere, the Department of Justice has recognized the same rule in this Circuit.  *See* U.S. Dep't of Just., *Guide to the Freedom of Information Act: Exemption 4,* at 4-5 (2019), https://www.justice.gov/oip/page/file/1207891/download ("The Court of Appeals for the District of Columbia Circuit . . . has specifically rejected the argument that the term 'commercial' be confined to records that 'reveal basic commercial operations,' holding instead that records are commercial so long as the submitter has a 'commercial interest' in them.").

Defendants' contortions to avoid the commercial function standard also reflect an attempt to improperly expand the basis of PHMSA's decision.  Relying solely on dated out-of-circuit precedent, PHMSA recognized only the possibility that information might be "commercial in

nature," based on the circumstances of its "development," and categorically distinguished that from "safety information" tied to "compliance obligations." Compl., Ex. T at 4 (citing *Chi. Trib. Co. v. FAA*, No. 97-2363, 1998 WL 242611, at *3 (N.D. Ill. May 7, 1998)). This obsolete, formalistic view is flatly inconsistent with case law in this circuit,[16] but it is the Final Determination's only interpretation of "commercial" information under Exemption 4.[17] *Id.* Defendants cannot now defend PHMSA's decision by going beyond that interpretation. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

### B. Sunoco Has Adequately Alleged a Commercial Interest in the Consequence Modeling Data

The Complaint alleges a straightforward explanation of Sunoco's commercial interests in the risk consequence modeling data. Disclosure of the data directly threatens the security of the pipeline and surrounding communities by helping bad actors identify the most vulnerable areas, and so disclosure incentivizes harmful action. Compl. ¶¶ 1, 3, 5, 22-23, 53-56, 64-65, 67; Ex. B; Ex. C; Ex. M; *see supra* Section III.B-C. The heightened threat necessarily implicates "Sunoco's commercial interests in the safe transportation of products in Pennsylvania and in interstate commerce." Compl. ¶ 64. Taking these allegations as true, Sunoco's "commercial fortunes"

---

[16] The *Chicago Tribune Co.* decision holds that "the information itself must be commercial *in nature*." 1998 WL 242611, at *3 (emphasis added). Unsurprisingly, this holding pre-dates the D.C. Circuit's distinction between the "nature" and "function" tests for commercial information in either *National Association of Home Builders*, 309 F.3d at 39, or *Baker & Hostetler LLP*, 473 F.3d at 319. In fact, the *Chicago Tribune Co.* court even misread *Critical Mass Energy Project*, which articulated a clearly functional view of power plant safety information. *See* 830 F.2d at 281.

[17] In any event, the Complaint satisfies Defendants' demand that the risk consequence modeling data relate to "basic commercial operations." Mot. to Dismiss at 10 (internal quotation marks omitted). Stantec completed the consequence modeling "in the course of Sunoco's commercial operations and for commercial purposes" because, "[w]ithout this information, Sunoco would be unable to comply with the federal pipeline safety regulations or operate the ME2 pipeline." Compl. ¶ 52; *see also id.* ¶¶ 1, 18. The redacted results are thus a direct outgrowth of Sunoco's basic commercial operations.

would not just be "materially affected" by these security consequences.  *Baker & Hostetler LLP*, 473 F.3d at 319 (quotation marks omitted).  Sunoco might face "the greatest possible harm and destruction to the ME2 pipeline and the surrounding communities," an existential risk to its commercial operations.  Compl. ¶ 65.  These allegations directly analogize to other security- or safety-related information found to carry commercial consequences.  *See Critical Mass Energy Project*, 830 F.2d at 280 ("safety problems"); *EPIC*, 117 F. Supp. 3d at 52-53, 62-63 (cyber vulnerabilities); *CREW*, 2021 WL 4502039, at *4 (disclosure producing "threats" or "harassment").

The Complaint also demonstrates the "instrumental" nature of the risk consequence modeling data in securing Sunoco's regulatory approvals for the ME2 pipeline.  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.  As Sunoco explained to PHMSA, "it is foreseeable that third parties could seek to use the protected information to contest or unnecessarily delay state or federal approvals for its projects."  Compl., Ex. M at 4; *see* Ex. R at 3 ("[T]hird-party actors clearly intend to deploy certain safety-related information about this project to delay, object to, or interfere with regulatory approvals."); *see also* Compl. ¶¶ 40, 43.  Indeed, the information before PHMSA independently confirmed this risk.  One requester of the redacted data is actively litigating against Sunoco's interests before the PA PUC.  Compl., Ex. B at 1-2; *see also* Compl. ¶ 23.  The other requester also acknowledges that it seeks the redacted data to examine "political problems the company has encountered with opponents, along with state and local regulators, who have questioned the safety plan for the project."  Compl., Ex. P at 1; *see also* Compl. ¶ 43.

PHMSA did not adequately address any of these consequences in its Final Determination. Moreover, PHMSA applied the wrong legal test by refusing to engage in a functional analysis of commercial consequences.  *E.g.*, Compl. ¶¶ 50, 66; Ex. T at 4.  Thus, it "entirely failed to consider

28

an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Its final conclusion on the risks created by disclosure "runs counter to the evidence before the agency." *Id.* This evidence included not only the expert opinions expressed in the Metro Affidavit and the GAO Report on security risks, Compl. ¶¶ 54-55, but also clear indications that the data would further regulatory opposition to the ME2 pipeline, Compl., Ex. B at 1-2; Ex. M at 4; Ex. P at 1; Ex. R at 3.  Finally, PHMSA ignored its own past practice and that of the wider industry to protect the confidentiality of this type of data.  Compl. ¶¶ 1, 20-21, 26, 29, 64; *see also Motor Vehicle Mfrs. Ass'n*, 463 at 42 ("[A]n agency changing its course . . . is obligated to supply a reasoned analysis for the change[.]").  Each of these problems demonstrates that PHMSA's decision that the information was not subject to the protections of Exemption 4 is arbitrary or capricious in violation of the APA.

## CONCLUSION

Based on the foregoing, Sunoco has sufficiently alleged that PHMSA's decision to publicly disclose the risk consequence modeling data is arbitrary and capricious in violation of the APA. The risk consequence modeling data is subject to the protections of Exemptions 4 and 7(F) and PHMSA's decision to the contrary is clear error.  As a result, Sunoco respectfully requests that the Court deny Defendants' Motion to Dismiss.  In the event that the Court grants the Motion to Dismiss, Sunoco respectfully requests that the Court grant it leave to amend its Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).

Dated:        October 15, 2021                    By: /s/ Dabney J. Carr, IV
                                                  Marc D. Machlin (D.C. Bar No. 358661)
                                                  TROUTMAN PEPPER HAMILTON
                                                  SANDERS LLP
                                                  401 Ninth Street, N.W., Suite 1000
                                                  Washington, D.C.  20004
                                                  202.220.1439
                                                  marc.machlin@troutman.com

                                                  Dabney J. Carr, IV (Bar ID: VA118)
                                                  TROUTMAN PEPPER HAMILTON
                                                  SANDERS LLP
                                                  Troutman Pepper Building
                                                  1001 Haxall Point
                                                  Richmond, VA 23219
                                                  804.697.1238
                                                  dabney.carr@troutman.com

                                                  *Attorneys for Plaintiff Sunoco Pipeline L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUNOCO PIPELINE L.P.,<br><br>               Plaintiff,<br>     v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION,<br>PIPELINE AND HAZARDOUS MATERIALS<br>SAFETY ADMINISTRATION, PETER<br>BUTTIGIEG, SECRETARY OF THE<br>DEPARTMENT OF TRANSPORTATION, IN HIS<br>OFFICIAL CAPACITY, AND TRISTAN BROWN,<br>ACTING ADMINISTRATOR OF THE PIPELINE<br>AND HAZARDOUS MATERIALS SAFETY<br>ADMINISTRATION, IN HIS OFFICIAL<br>CAPACITY,<br><br>               Defendants. | Civil Action No. 1:21-cv-01760-TSC |

## CERTIFICATE OF SERVICE

On this 15th day of October 2021, I hereby certify that a copy of the foregoing Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss has been filed on CM/ECF. Pursuant to Local Rule 5.4, this filing constitutes service on all parties of record.

Respectfully submitted,

Dated:     October 15, 2021

By:  /s/ Dabney J. Carr, IV
Marc D. Machlin (D.C. Bar No. 358661)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 Ninth Street, N.W., Suite 1000
Washington, D.C.  20004
202.220.1439
marc.machlin@troutman.com

Dabney J. Carr, IV (Bar ID: VA118)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Troutman Pepper Building
1001 Haxall Point
Richmond, VA 23219
804.697.1238

dabney.carr@troutman.com

*Attorneys for Plaintiff Sunoco Pipeline L.P.*