**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

SUNOCO PIPELINE, L.P.,

       Plaintiff,

  v.

U.S. DEPARTMENT OF
TRANSPORTATION, *et al.*,

       Defendants.

---

Case No. 1:21-cv-01760-TSC

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Argument ......................................................................................................................2

I.    Sunoco does not allege a cognizable reverse-FOIA claim under the APA. ................2

       A.    Sunoco does not allege a violation of the Trade Secrets Act and,
in any event, the Trade Secrets Act does not have the same scope
as FOIA's exemption 4 ....................................................................................4

       B.    Sunoco does not plausibly allege that any agency regulations prohibit
disclosure of the risk-analysis data at issue. ....................................................11

II.    The risk-analysis data at issue does not fall within a FOIA exemption. ...................14

       A.    The general risk-analysis data redacted in the NOPV does not fall within
FOIA's exemption 7(F) because it could not reasonably be expected to
endanger any individual. ................................................................................14

       B.    The pipeline-rupture data is not "commercial" information within the
meaning of FOIA's exemption 4 ....................................................................19

             1.    The pipeline-rupture data is not "commercial" information
under the proper legal framework. ....................................................20

             2.    Sunoco's purported "commercial interests" fail on their own
terms. ...............................................................................................23

Conclusion ..................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*9 to 5 Org. for Women Off. Workers v. Bd. of Governors of Fed. Rsrv. Sys.,
721 F.2d 1 (1st Cir. 1983) ....................................................................................... 5

*100Reporters LLC v. U.S. Dep't of Just.,
316 F. Supp. 3d 124 (D.D.C. 2018) ...................................................................... 21

Alphapointe v. Dep't of Veterans Affairs,
475 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................... 15

Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States,
489 F. Supp542 F.2d 1190. 3d 106 (E.D.N.Y. 2020) ........................................... 12

*Ashcroft v. Iqbal,
556 U.S. 662 (2009) .................................................................................... 4, 5, 16

*Baker & Hostetler LLP v. U.S. Dep't of Com.,
473 F.3d 312 (D.C. Cir. 2006) ........................................................................ 9, 22

*Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) .......................................................................................... 4, 8

*Besson v. U.S. Dep't of Com.,
480 F. Supp. 3d 105 (D.D.C. 2020) ................................................ 20, 21, 22, 23

*Canadian Com. Corp. v. Dep't of Air Force,
514 F.3d 37 (D.C. Cir. 2008) .............................................................................. 10

Chandler v. Greater Bos. Legal Servs.,
2013 WL 6571938 (D. Mass. Dec. 10, 2013) ........................................................ 5

*Charles River Park A, Inc. v. U.S. Dep't of Hous. & Urb. Dev.,
519 F.2d 935 (D.C. Cir. 1975) ..................................................................... 6, 7, 15

*Chicago Trib. Co. v. FAA,
1998 WL 242611 (N.D. Ill. May 7, 1998) ........................................................... 21

*Chrysler Corp. v. Brown,
441 U.S. 281 (1979) ................................................................................ 2, 3, 12, 15

*Chrysler Corp. v. Schlesinger,*
    565 F.2d 1172 (3d Cir. 1977) ........................................................................ 8

*\*CNA Fin. Corp. v. Donovan,*
    830 F.2d 1132 (D.C. Cir. 1987) ........................................................... *passim*

*Comptel v. FCC,*
    945 F. Supp. 2d 48 (D.D.C. 2013) ............................................................... 21

*Critical Mass Energy Project v. Nuclear Regul. Comm'n,*
    830 F.2d 278 (D.C. Cir. 1987) ...................................................................... 22

*Dep't of the Air Force v. Rose,*
    425 U.S. 352 (1976) ....................................................................................... 14

*Env't Integrity Project v. EPA,*
    969 F.3d 529 (5th Cir. 2020) ......................................................................... 12

*Feng Wang v. Pompeo,*
    2020 WL 1451598 (D.D.C. Mar. 25, 2020) ................................................. 15

*\*Food Mktg. Inst. v. Argus Leader Media,*
    139 S. Ct. 2356 (2019) ................................................................................ 8, 9

*\*Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n,*
    750 F.2d 1394 (7th Cir. 1984) ..................................................................... 6, 7

*Gen. Motors Corp. v. Marshall,*
    654 F.2d 294 (4th Cir. 1981) ........................................................................... 6

*Gretzula v. Camden Cnty. Tech. Sch. Bd. of Educ.,*
    965 F. Supp. 2d 478 (D.N.J. 2013) ................................................................. 5

*\*Intell. Prop. Watch v. U.S. Trade Representative,*
    134 F. Supp. 3d 726 (S.D.N.Y. 2015) .......................................................... 20

*Lamie v. U.S. Trustee,*
    540 U.S. 526 (2004) ....................................................................................... 12

*\*Living Rivers, Inc. v. U.S. Bureau of Reclamation,*
    272 F. Supp. 2d 1313 (D. Utah 2003) .......................................................... 18

iii

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,
    375 F.3d 1182 (D.C. Cir. 2004)...................................................................9, 10

*McDonnell Douglas Corp. v. Widnall,
    57 F.3d 1162 (D.C. Cir. 1995)......................................................................9, 15

McDonnell Douglas Corp.v NASA,
    180 F.3d 303 (D.C. Cir. 1999).........................................................................4

*Megapulse, Inc. v. Lewis,
    672 F.2d 959 (D.C. Cir. 1982)........................................................................15

*Nat'l Ass'n of Home Builders v. Norton,
    309 F.3d 26 (D.C. Cir. 2002)..........................................................19, 21, 22, 25

*New York Times Co. v. U.S. Food & Drug Admin.,
    --- F. Supp. 3d ---, 2021 WL 1178126 (S.D.N.Y. Mar. 29, 2021)...........................21, 22

Pinson v. Dep't of Just.,
    236 F. Supp. 3d 338 (D.D.C. 2017).................................................................14

Pub. Citizen Found. v. U.S. Dep't of Labor,
    2020 WL 9439355 (D.D.C. June 23, 2020).........................................................21

*Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.,
    704 F.2d 1280 (D.C. Cir. 1983)................................................................20, 23, 24

Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.,
    975 F. Supp. 2d 81 (D.D.C. 2013)...................................................................21

*Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n,
    740 F.3d 195 (D.C. Cir. 2014)...................................................................18, 19

*Reps. Comm. for Freedom of the Press v. FBI,
    3 F.4th 350, 369 (D.C. Cir. 2021)...................................................................13

Rose v. U.S. Dep't of Just.,
    2019 WL 1597736 (D.D.C. Apr. 15, 2019).........................................................3

Rural Hous. All. v. U.S. Dep't of Agric.,
    498 F.2d 73 (D.C. Cir. 1974).........................................................................9

*Segrest v. Franklin Am. Mortg. Co.*,
    2013 WL 12392538 (W.D. Tex. May 14, 2013) ............................................................ 16

*Seife v. Food & Drug Admin.*,
    492 F. Supp. 3d 269 (S.D.N.Y. 2020) ....................................................................... 9

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    249 F. Supp. 3d 516 (D.D.C. 2017) ................................................................ 18, 19

*\*Tripp v. Dep't of Def.*,
    193 F. Supp. 2d 229 (D.D.C. 2002) .......................................................... 3, 4, 12

*W. Watersheds Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) ........................................................................ 13

*Wells v. Brown*,
    891 F.2d 591 (6th Cir. 1989) .................................................................................. 5

*\*Westchester Gen. Hosp., Inc. v. Dep't of Health, Ed. & Welfare*,
    464 F. Supp. 236 (M.D. Fla. 1979) ......................................................................... 7

*\*Westinghouse Electric Corp. v. Schlesinger*,
    542 F.2d 1190 (4th Cir. 1976) ................................................................................ 7

**Statutes**

5 U.S.C. § 552 ............................................................................................. *passim*

5 U.S.C. § 706 ...................................................................................................... 15

18 U.S.C. § 1905 ...................................................................................... 5, 7, 8, 11

**Regulations**

49 C.F.R. Part 7 ......................................................................................... *passim*

49 C.F.R. Part 190 ............................................................................................... 11

49 C.F.R. § 7.23 .................................................................................. 2, 3, 11, 12, 13

49 C.F.R. § 190.343 ...................................................................................... 11, 14

**Other Authorities**

Bernard Bell, *Food Marketing Institute: A Preliminary Assessment (Part II)*,
Yale J. on Regul.: Notice & Comment (July 8, 2019) ....................................................... 8

Charles Tait Graves & Sonia K. Katyal, *From Trade Secrecy to Seclusion*,
109 Geo. L.J. 1337 (2021) ................................................................................................ 9

H.R. Rep. No. 880 (1975), *as reprinted in* 1976 U.S.C.C.A.N. 2183 .................................... 6

Jane E. Kirtley et al., *Than Good: Recrafting FOIA's Exemption 4 After*
*Food Marketing Institute v. Argus Leader Media*,
46 Mitchell Hamline L. Rev. 497 (2020) ......................................................................... 9

Jane G. Farrell, *The Death Knell That Wasn't: Public Access to Federal Contractor*
*Employment Data After Argus Leader Media*,
42 Berkeley J. Emp. & Lab. L. 423 (2021) ........................................................... 7, 8, 9, 10

Stuart Turner et al., *Argus Leader After A Year In The Wild: Judicial Application Of FOIA*
*Exemption 4 In The Post-Argus Leader World*,
63 No. 2 Government Contractor (2021) ....................................................................... 10

U.S. Department of Transportation, *Chief FOIA Officer Report* (March 2015) ....................... 13

U.S. Department of Transportation, *Chief FOIA Officer Report* (March 2016) ....................... 13

## INTRODUCTION

This case is about whether Plaintiff Sunoco can force the government to redact a few lines of safety information concerning the general effects of a potential pipeline rupture from a 10-page Notice of Probable Violation (NOPV) that cites Sunoco for certain pipeline-safety infringements. This case is *not* about whether the government can disclose the underlying reports that Sunoco commissioned from Stantec Consulting Ltd., which provide much more detailed risk-analysis data about a potential pipeline rupture. That distinction—which Sunoco strains to ignore—undermines many of Sunoco's arguments. In fact, Sunoco has no response to the agency's observation that the redacted information at issue "is general in nature and does not identify any particular areas of weakness or points of vulnerability" in the approximately 350-mile pipeline and therefore "does not provide specific targeting information that could be used by a potential bad actor." Compl. Ex. T at 6, ECF No. 1-1. That's why the redacted information at issue is outside FOIA exemption 7(F)'s protection for law-enforcement information that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F); *see* Defs.' Mot. at 11–12, ECF No. 12.

 It is also outside exemption 4's protection for "commercial" information that is "privileged or confidential" because it is not in any sense "commercial," like sales statistics, income, profits, losses, inventories, operating costs, or customer lists. *Id.* § 552(b)(4); Defs.' Mot. at 7–11. Sunoco counters that anything—even external facts about the world unrelated to its business strategy or capabilities—is covered by exemption 4 as long as its disclosure may affect the company's "commercial fortunes." Pl.'s Opp'n at 24–29, ECF No. 13. That is not the law. And Sunoco's theory would render irrelevant Congress's protection for only "trade secrets" and "commercial or financial information." 5 U.S.C. § 552(b)(4).

But none of this matters because Sunoco has not alleged, as it must in a reverse-FOIA case, that some law other than FOIA affirmatively *prohibits* disclosure of the general pipeline-rupture information at issue. Defs.' Mot. at 4–7. The company primarily attempts to dodge this pleading deficiency by relying on a law that is entirely absent from its complaint: the

1

Trade Secrets Act, which Sunoco says is coextensive with exemption 4. But even if the Court were inclined to allow this unpled legal theory, the Trade Secrets Act is not necessarily coextensive with exemption 4, and the company makes no attempt to argue that the information redacted from the NOPV falls within the Trade Secrets Act's specified categories. Sunoco fares no better in relying on a regulation that does nothing more than say the agency will make reasonably described nonexempt materials available upon request. Pl.'s Opp'n at 14–17 (citing 49 C.F.R. § 7.23(b)). That regulation says nothing about what the agency may do with *exempt* materials, much less explicitly *mandate* that such materials must be withheld. So that regulation cannot form the basis of Sunoco's reverse-FOIA claim either.

When Sunoco decided to file this suit, it chose to bear the burden of plausibly alleging a cognizable reverse-FOIA claim. It cannot. Although the company now argues that Defendants' motion goes beyond the "grounds invoked by the agency," Pl.'s Oppn' at 2, that is only because the agency had no need to consider the threshold issues here—whether some law prohibits disclosure—since the agency correctly found that the pipeline-rupture information at issue is *not* exempt from disclosure under FOIA. Sunoco cannot now escape its pleading burden by faulting the agency for failing to address issues that have only arisen because Sunoco filed a legally deficient reverse-FOIA complaint. To hold otherwise would allow the company to proceed on a defective claim simply because the agency could not predict the future. Sunoco's arguments should be rejected and its complaint should be dismissed.

## ARGUMENT

### I.    Sunoco does not allege a cognizable reverse-FOIA claim under the APA.

As Defendants previously explained, reverse-FOIA cases fail to state a claim when a plaintiff—like Sunoco here—simply alleges that the agency misapplied certain FOIA exemptions. Defs.' Mot. 4–5 (collecting cases). That's because "FOIA is exclusively a disclosure statute." *Chrysler Corp. v. Brown*, 441 U.S. 281, 292 (1979). And FOIA exemptions generally "*allow* agencies to withhold documents, but do not *require* withholding." *Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002); *Chrysler*, 441 U.S. at 292. So to state a cognizable

"reverse-FOIA" claim, Sunoco "must show that the release of the information at issue was somehow unlawful," and "[i]n order to make this showing, plaintiff generally ca[nn]ot rely on a claim that a FOIA exemption requires the withholding of information from disclosure." *Tripp*, 193 F. Supp. 2d 229 at 238. Sunoco appears to concede that it must identify some law prohibiting disclosure, Pl.'s Opp'n at 12, but its complaint is devoid of any such allegations.[1]

Instead, Sunoco now argues that disclosure is prohibited by two belatedly invoked authorities. The first is the Trade Secrets Act, which Sunoco concedes is absent from its complaint. Pl.'s Opp'n at 14. That concession alone warrants dismissal because it is not the Court's job to scour the complaint in search of possible claims, and is "well settled law that a plaintiff cannot amend his complaint by the briefs in opposition to a motion to dismiss." *Rose v. U.S. Dep't of Just.*, 2019 WL 1597736, at *2 (D.D.C. Apr. 15, 2019) (Chutkan, J.) (citations omitted). Even if Sunoco could proceed on an unpled claim, though, FOIA's exemption 4 does not have the same scope as the Trade Secrets Act for all purposes and cases, and it therefore cannot form the basis of a reverse-FOIA claim. Sunoco's second attempt seems to be an agency regulation simply noting that the agency will make reasonably described records available "except to the extent that the records contain information exempt from FOIA's mandate of disclosure." 49 C.F.R. § 7.23(b). But that provision only says that the agency will make reasonably described *nonexempt* materials available upon request; it says nothing about what the agency may do with *exempt* materials, and it certainly does not *mandate* that such materials

---

[1] Sunoco nonetheless quibbles that this is "beyond the grounds for PHMSA's decision because PHMSA did not rely on its discretion with regard to Exemption 4." Pl.'s Opp'n at 12. But the agency correctly found that the risk-analysis data at issue is *not* exempt from disclosure, so there was no reason for the agency to invoke its inherent discretion. *See* Compl. Ex. T at 2–8. And regardless, the agency's discretion to disclose exempt information always exists as a matter of law, which is why a plaintiff must identify some law *prohibiting* disclosure to state a cognizable reverse-FOIA claim. Defs.' Mot. at 4–5. Sunoco bears the burden of plausibly alleging such a claim. It cannot escape that burden by faulting the agency for failing to address an issue that has only arisen because Sunoco filed a legally deficient reverse-FOIA complaint.

must be withheld.  Because Sunoco has not plausibly alleged that disclosure of the unredacted NOPV is contrary to any law, it has failed to state an actionable reverse-FOIA claim under the APA.  *Tripp*, 193 F. Supp. 2d at 239.  Sunoco's complaint should therefore be dismissed.

### A.   Sunoco does not allege a violation of the Trade Secrets Act and, in any event, the Trade Secrets Act does not necessarily have the same scope as FOIA's exemption 4.

While Sunoco now claims that the Trade Secrets Act prohibits disclosure of the pipe-line-rupture information in the NOPV, that claim appears nowhere in the complaint.  *See generally* Compl. ¶¶ 1–68.  Nor does Sunoco's complaint allege, as the company now asserts, that "when a person can show that information falls within Exemption 4, then the government is precluded from releasing it under the Trade Secrets Act."  Pl.'s Opp'n at 13 (quoting *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 305 (D.C. Cir. 1999)).  Put simply, Sunoco's reverse-FOIA claim under the APA is not based on the Trade Secrets Act or any other law prohibiting disclosure, and it therefore fails to state a claim.

That is enough for this Court to dismiss the complaint, at least without prejudice.  Sunoco attempts to escape this straightforward conclusion by arguing that it need not "explic-itly cite the Trade Secrets Act" because "Rule 8 turns not on the legal conclusions of the complaint but on the plausible violations that may be *inferred* from alleged facts."  Pl.'s Opp'n at 14 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).  But Rule 8 actually requires "a short and plain statement of the *claim* showing that the pleader is entitled to relief, in order to give the defendant fair notice of *what the claim is* and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added).  Sunoco cites nothing for the proposition that a plaintiff, especially one represented by sophisticated counsel, can simply allege various facts and make the court sort out whether those facts correspond to any viable legal claim.  To the contrary, "[t]he trial and appellate courts should not have to guess at the nature of the claim asserted."  *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).  And a "[p]laintiff cannot require Defendants to infer legal claims that are not explicitly stated."

*Gretzula v. Camden Cnty. Tech. Sch. Bd. of Educ.*, 965 F. Supp. 2d 478, 483 n.2 (D.N.J. 2013));
*Chandler v. Greater Bos. Legal Servs.*, 2013 WL 6571938, at *4 (D. Mass. Dec. 10, 2013) (explaining that "[t]he onus is on [the plaintiff] to submit a Complaint that identifies . . . the legal causes of action he seeks to assert").  That's why *Twombly* and *Iqbal*—the landmark Supreme Court cases establishing the relevant standard of review—both started their motion-to-dismiss analysis with the elements of the *legal claims* in the complaint, not the alleged facts.  *See Iqbal*, 556 U.S. at 675 (explaining that both cases begin "by taking note of the elements a plaintiff must plead to state a claim").  This straightforwardly contradicts Sunoco's request to have the Court infer a cause of action absent from the complaint.  Pl.'s Opp'n at 14.

Pleading deficiencies aside, Sunoco's theory is based on the mistaken premise that the Trade Secrets Act is "co-extensive" with FOIA's exemption 4 for all purposes.  Pl.'s Opp'n at 13 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1140 (D.C. Cir. 1987)).  Exemption 4 allows agencies discretion to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  The Trade Secrets Act, in contrast, is a criminal statute that prohibits disclosure "to any extent not authorized by law" of information "concern[ing] or relat[ing] to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association."  18 U.S.C. § 1905.  These two statutes are certainly coextensive in some sense: if information does *not* fall within exemption 4, then FOIA mandates disclosure and that disclosure is allowed under the Trade Secrets Act because it is "authorized by law." *CNA Fin. Corp*, 830 F.2d at 1152 n.139 (noting that "FOIA would provide legal authorization for and compel disclosure of financial or commercial material that falls outside of Exemption 4"); *9 to 5 Org. for Women Off. Workers v. Bd. of Governors of Fed. Rsrv. Sys.*, 721 F.2d 1, 12 (1st Cir. 1983) ("[I]f the government cannot prove that the requested documents are within FOIA exemption 4, their disclosure will not violate section 1905.").  As one court put it, "[e]xemption 4 is broadly worded, and it is hard to believe that Congress wanted" FOIA requesters "to

stub their toes on a rather obscure criminal statute almost certainly designed to protect that narrower category of trade secrets—secret formulas and the like—whose disclosure could be devastating to the owners and not just harmful." *Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n*, 750 F.2d 1394, 1402 (7th Cir. 1984); *see also CNA Fin. Corp*, 830 F.2d at 1152 n.138 (favorably citing *Gen. Elec. Co.* and *9 to 5 Org. for Women Off. Workers*).

But the coextensiveness ends there. If information falls *within* exemption 4, it may or may not also fall within the Trade Secrets Act's prohibition on disclosure. The House of Representatives Report on the Government in the Sunshine Act—which amended FOIA in 1976—could hardly be any clearer on this point. "[I]f material d[oes] not come within" FOIA's exemption 4, the Trade Secrets Act "would not justify withholding" because disclosure would be "authorized by law." H.R. Rep. No. 880, pt. 1, at 23 (1975), *as reprinted in* 1976 U.S.C.C.A.N. 2183, 2205; *CNA Fin. Corp.*, 830 F.2d at 1138 n.70 (quoting same); *Gen. Motors Corp. v. Marshall*, 654 F.2d 294, 297 n.9 (4th Cir. 1981) (quoting same). But "if material is within" exemption 4 "and therefore subject to disclosure if the agency determines that disclosure is in the public interest, [the Trade Secrets Act] must be considered to ascertain whether the agency is forbidden from disclosing the information." *Id.*; *accord Charles River Park A, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 519 F.2d 935, 941 n.7 (D.C. Cir. 1975) (noting that "consideration of [the Trade Secrets Act] in FOIA cases is appropriate only when the information falls both within the fourth exemption and under [the Trade Secrets Act]").

Surprisingly enough, Defendants are aware of no court that has undertaken a comprehensive analysis of the two statutory provisions to determine how much material covered by exemption 4—which broadly captures "trade secrets" and confidential "commercial or financial information"—is also covered by the Trade Secrets Act—which only captures certain categories of information, like "the amount or source of any income, profits, losses, or expenditures." *Compare* 5 U.S.C. § 552(b)(4) *with* 18 U.S.C. § 1905; *see also Gen. Elec. Co.*, 750 F.2d at 1402; *Charles River*, 519 F.2d at 943 ("[T]he court must bear in mind that [the Trade Secrets Act] is a criminal statute and should be narrowly construed."). Instead, beginning

with the Fourth Circuit's 1976 decision in *Westinghouse Electric Corp. v. Schlesinger*, courts relied on conclusory statements and misunderstandings of prior case law to hold that FOIA's exemption 4 and the Trade Secrets Act are "the same" or "co-extensive." *Compare* 542 F.2d 1190, 1205 n.38 (4th Cir. 1976) *with* Jane G. Farrell, *The Death Knell That Wasn't: Public Access to Federal Contractor Employment Data After Argus Leader Media*, 42 Berkeley J. Emp. & Lab. L. 423, 450–51 & n.160 (2021) (detailing how "each of the four cases cited [in *Westinghouse*] had a narrower holding than the Fourth Circuit recognized, and none held that the two provisions were necessarily 'coextensive'") *and Westchester Gen. Hosp., Inc. v. Dep't of Health, Ed. & Welfare*, 464 F. Supp. 236, 248 (M.D. Fla. 1979) ("Contrary to the Fourth Circuit's view," the cases cited in *Westinghouse* "do not contain or entail the conclusion that information which qualifies for Exemption 4 of the FOIA 'necessarily' falls within the prohibition of § 1905.").

That includes the D.C. Circuit's decision in *CNA Financial Corp.*, which sought to "definitively" resolve the issue. *CNA Fin. Corp.*, 830 F.2d at 1134. There, after finding that the Trade Secrets Act was broader than its three predecessor statutes, the court proclaimed that "the scope of the [Trade Secrets] Act is at least co-extensive with that of Exemption 4 of FOIA" without actually comparing the Trade Secrets Act's text with exemption 4's text. Instead, the court relied on three inapposite cases for this conclusion. *Compare id.* at 1151 *with* Farrell, *supra*, at 451 & n.164 (detailing how "each of these three cases is either narrower than the D.C. Circuit characterized or buttressed by the same conclusory reasoning as *Westinghouse*, if not by *Westinghouse* itself") *and Charles River*, 519 F.2d at 943 (elucidating that "the district court should determine whether the information sought falls within the fourth exemption to the FOIA," and if so, then it "must consider [the Trade Secrets Act] and determine whether the information sought falls within the specific prohibitions therein contained"). Subsequent cases merely repeat this "co-extensive" conclusion without any analysis. *See* Bernard Bell, *Food Marketing Institute: A Preliminary Assessment (Part II)*, Yale J. on Regul.: Notice & Comment (July 8, 2019), available here ("The cases that find the statutes coterminous offer little supporting analysis."); *see, e.g.*, Pl.'s Opp'n at 13 (citing cases).

This is troubling because the statutory text bears almost no sign that *all* information covered by exemption 4 is necessarily covered by the Trade Secrets Act. Indeed, the only common terms between exemption 4 and the Trade Secrets Act are "trade secrets" and "confidential," with the latter term in the Trade Secrets Act referring specifically to "confidential statistical data."[2] *Compare* 5 U.S.C. § 552(b)(4) *with* 18 U.S.C. § 1905. That makes sense because "[t]here is little indication that the enacting Congresses actually considered the scope of the Trade Secrets Act and FOIA Exemption 4 coterminous." Farrell, *supra* at 454 (quoting Bell, *supra*). The Trade Secrets Act was "adopted as a part of Congress's general revision of the Criminal Code in 1948, 18 years before FOIA was adopted." *Id.* (quoting Bell, *supra*). Yet exemption 4 "does not discuss the [Trade Secrets Act], and the accompanying congressional reports make no reference to the statute." *Id.* (quoting Bell, *supra*). So while there may be substantial overlap between the information covered by exemption 4 and the Trade Secrets Act, it is entirely possible that some information—like, for example, letters describing market conditions or loan-application information—may fall under the former but not the latter. *Cf. Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006); *Rural Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 79 (D.C. Cir. 1974).

Regardless, the Supreme Court's decision in *Argus Leader* dramatically changes the landscape in this area. There, the Supreme Court overturned the substantial-competitive-

---

[2] Although the D.C. Circuit noted that the Trade Secrets Act "encompasses virtually every category of business information likely to be in the files of an agency," that statement was directed only at the court's conclusion that the "laundry list of information that the [Trade Secrets] Act sets out does not specify 'particular types of matters' for purposes of satisfying Subsection (B) of Exemption 3." *CNA Fin. Corp.*, 830 F.2d at 1141 (citation omitted). It does not speak to whether the Trade Secrets Act is coextensive with exemption 4. Not to mention that this dicta relied on cursory language from an overruled Third Circuit decision, which failed to perform a comprehensive textual analysis. *CNA Fin. Corp.*, 830 F.2d at 1140 (quoting *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172, 1186 (3d Cir. 1977), *overruled by Chrysler Corp. v. Brown*, 441 U.S. 281 (1979)). As the Supreme Court has since made clear in this context, "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).

harm test—long used to determine whether information is "confidential" within the meaning of exemption 4—and instead held that information is "confidential" when it is "both customarily and actually treated as private by its owner." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).[3]  "The result of *Argus Leader*, commentators have concluded, is a sizeable expansion of Exemption 4."  Charles Tait Graves & Sonia K. Katyal, *From Trade Secrecy to Seclusion*, 109 Geo. L.J. 1337, 1363 (2021); Jane E. Kirtley et al., *More "Substantial Harm" Than Good: Recrafting FOIA's Exemption 4 After Food Marketing Institute v. Argus Leader Media*, 46 Mitchell Hamline L. Rev. 497, 524 (2020) (noting Senator Grassley's view that *Argus Leader* "significantly broadened the scope of Exemption 4").

And when there is a "more expansive interpretation of the scope of Exemption 4," the D.C. Circuit has recognized that it may "no longer [be] accurate" to characterize exemption 4 and the Trade Secrets Act as coextensive.  *McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1165 n.2 (D.C. Cir. 1995) (referencing its decision expanding the scope of exemption 4 in *Critical Mass*); *see McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1204 & n.17 (D.C. Cir. 2004) (Garland, J., concurring in part); *Seife v. Food & Drug Admin.*, 492 F. Supp. 3d 269, 279 n.3 (S.D.N.Y. 2020); *Farrell*, *supra*, at 453–54.  Indeed, prior cases finding exemption 4 and the Trade Secrets Act to be coextensive were "themselves explicitly based on" the cases overruled in *Argus Leader*.  Stuart Turner et al., *Argus Leader After A Year In The Wild: Judicial Application Of FOIA Exemption 4 In The Post-Argus Leader World*, 63 No. 2 Government Contractor ¶ 9 (2021); *see, e.g.*, *Canadian Com. Corp. v. Dep't of Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008) (relying on the *National Parks* standard for exemption 4's scope that was overruled in *Argus Leader*); *McDonnell Douglas Corp.*, 375 F.3d at 1187 (same); *CNA Fin. Corp.*,

---

[3] The Supreme Court left open the question of whether information must also be "provided to the government under an assurance of privacy" to remain "confidential." *Argus Leader*, 139 S. Ct. at 2363, 2366.

830 F.2d at 1152 (same).  So if exemption 4 was ever coextensive with the Trade Secrets Act, it no longer is.  *See* Farrell, *supra*, at 430 (noting that *Argus Leader* "decoupled Exemption 4 from the [Trade Secrets Act], meaning the two are no longer coextensive").

All this is to say that Sunoco's liberal reading of its complaint fails under *Chrysler* because exemption 4 does not prohibit disclosure and exemption 4 does not necessarily have the same scope as the Trade Secrets Act (which does prohibit disclosure).  *See* Defs.' Mot. at 4–5 (collecting cases for proposition that a cognizable reverse-FOIA claim must show that release of the information at issue is somehow unlawful).  If Sunoco wants to advance its reverse-FOIA claim under the Trade Secrets Act, it would need to plausibly allege that the risk-analysis data at issue is both shielded from disclosure by that statute and within exemption 4.  But as Defendants have already explained, and Sunoco has failed to refute, it has not and could not do so.  Defs.' Mot. at 6; *see also id.* at 7–11 (explaining that the data doesn't fall within exemption 4).[4]

In fact, Sunoco does not even attempt to argue that the pipeline-rupture information redacted from the NOPV falls within the Trade Secrets Act.  *See* Pl.'s Opp'n at 13–14.  The company instead invokes the underlying Stantec reports—not the limited, non-location-specific information redacted from the NOPV—to argue that "the risk consequence modeling data falls within Exemption 4 and that its release is prohibited by the Trade Secrets Act."  *Id.* at 13.  But even the *CNA* court didn't think *every* piece of information that falls within exemption 4 also falls within the Trade Secrets Act.  *See CNA Fin. Corp.*, 830 F.2d at 1140 (noting, in its exemption 3 analysis, that "the Trade Secrets Act appears to cover *practically* any commercial or financial data collected by any federal employee").  And the pipeline-rupture in-

---

[4] Even if exemption 4 and the Trade Secrets Act are deemed coextensive for all purposes and cases, Sunoco's putative Trade Secrets Act claim would fail because the risk-analysis data at issue is not protected by exemption 4.  *See* Defs.' Mot. at 7–11; Section II.B., *infra*.  So FOIA mandates disclosure and that disclosure is allowed under the Trade Secrets Act because it is "authorized by law."  18 U.S.C. § 1905.

formation at issue is quite simply not captured by the Trade Secrets Act's delineated categories. It does not "concern[] or relate[] to the trade secrets, processes, operations, style of work, or apparatus . . . of any person, firm, partnership, corporation, or association." 18 U.S.C. § 1905. Nor does it "concern[] or relate[] to . . . the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association." *Id.* Sunoco has not stated a claim that the Trade Secrets Act bars release of the risk-analysis data at issue, nor could it. So its complaint should be dismissed with prejudice. Defs.' Mot. at 14.

> **B.** **Sunoco does not plausibly allege that any agency regulations prohibit disclosure of the risk-analysis data at issue.**

Sunoco next turns to agency regulations, attempting to show that they prohibit disclosure. Pl.'s Opp'n at 14–17. Specifically, the company relies on 49 C.F.R. § 7.23,[5] which states the unremarkable proposition that, "[a]s provided in 5 U.S.C. § 552(a)(3)(A)," the agency "makes reasonably described records available upon request from a member of the public . . . except to the extent that the records contain information exempt from FOIA's mandate of disclosure as provided in 5 U.S.C. § 552(b)."[6] 49 C.F.R. § 7.23(b); Pl.'s Opp'n at 14–17.

As Defendants explained, this provision simply notes that the agency will make reasonably described *nonexempt* materials available upon request; it says nothing about what the agency may do with *exempt* materials, much less explicitly *mandate* that such materials must

---

[5] Sunoco has rightly abandoned its reliance on 49 C.F.R. § 190.343 as a basis for its reverse-FOIA claim. *Compare* Compl. ¶ 61 (citing "DOT regulations at 49 C.F.R. Part 7 and PHMSA regulations at 49 C.F.R. Part 190") *with* Pl.'s Opp'n at 14–17.

[6] Sunoco again argues that "PHMSA failed to address [§ 7.23(b)] in its Final Determination." Pl.'s Opp'n at 16. But, again, the agency correctly found that the risk-analysis data at issue is *not* exempt from disclosure, so there was no reason for the agency to address what it would do with *exempt* materials under § 7.23(b). *See* Compl. Ex. T at 2–8. As Defendants explained above, Sunoco chose to bear the burden of plausibly alleging that "the release of the information at issue was somehow unlawful" when it filed this suit. *Tripp*, 193 F. Supp. 2d at 238. And it cannot now escape that burden by faulting the agency for failing to address an issue that has only arisen because Sunoco filed a legally deficient reverse-FOIA claim.

be withheld.  Defs.' Mot. at 6–7.  "The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it."  *Env't Integrity Project v. EPA*, 969 F.3d 529, 541 (5th Cir. 2020) (citation omitted).  So, understandably, a law "should not be read to include matter it does not include."  *Id.*; *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106, 132 (E.D.N.Y. 2020) (applying this principle to a regulation); *cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (rejecting construction that "would have us read an absent word into the statute" because it "would result not in a construction of the statute, but, in effect, an enlargement of it by the court" (citations omitted)).  Yet that is exactly what Sunoco seeks here by urging an atextual interpretation of the regulation.

Contrary to Sunoco's faulty analysis, § 7.23(b)'s notation that the agency will make reasonably described records available "except to the extent that the records contain information exempt from FOIA's mandate of disclosure" is not meaningless.  Pl.'s Opp'n at 15. The point of § 7.23(b) is to clarify that reasonably described nonexempt records are *automatically* made available, while exempt records are not.  That makes sense in light of § 7.23(b)'s title—"[s]tatutory disclosure requirement"—which makes clear that the provision speaks only to mandated *disclosure*, not any mandated *withholding*.  And that also make sense because § 7.23(b) twice references FOIA itself, which indisputably allows agencies discretion to release materials that fall within FOIA exemptions.  *Chrysler*, 441 U.S. at 292 (explaining that FOIA exemptions only "demarcate[] the agency's obligation to disclose"; they "do[] not foreclose disclosure").  It is no surprise, then, that the agency routinely provides such discretionary disclosures.  In its 2015 and 2016 FOIA reports, for example, the agency said that it "encourages and supports the discretionary release of records," and that "during the reporting period, the majority of DOT's components made discretionary releases of information otherwise exempt from disclosure—primarily under Exemption 5."  U.S. Department of Transpor-

tation, *Chief FOIA Officer Report* (March 2015), available here; U.S. Department of Transportation, *Chief FOIA Officer Report* (March 2016), available here.[7]  Yet, if Sunoco were correct, all of those discretionary releases were illegal under § 7.23(b).  Sunoco is simply wrong; the agency has not been openly flouting its own regulations for the better part of a decade.[8]

If the straightforward text of § 7.23 were not enough, the regulation makes clear the agency's "policy to make its records available to the public to the greatest extent possible, in keeping with the spirit of FOIA."  49 C.F.R. § 7.23(a).  Contrary to Sunoco's reading, that policy "includes," but is hardly limited to, "releasing reasonably segregable and meaningful nonexempt information in a document from which exempt information is withheld."  *Compare id. with* Pl.'s Opp'n at 16.  After all, "[d]isclosure, not secrecy, is the dominant objective of FOIA."  *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 358 (D.D.C. 2017) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  And as Sunoco readily acknowledges, other regulations specifically contemplate that the agency may "decide[] to disclose the information over [a party's] objections," and "will notify [the party] in writing" if it is about to do so.  49

---

[7] "The court may take judicial notice of documents provided on official government websites."  *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 36 n.4 (D.D.C. 2020) (collecting cases).

[8] Sunoco also cannot rely on 49 C.F.R. § 7.23(d).  Pl.'s Opp'n at 15 n.9.  This agency regulation echoes the FOIA Improvement Act, which provides that, even if an agency determines information falls within a FOIA exemption, it still cannot withhold it unless the agency *also* "reasonably foresees that disclosure would harm an interest protected by an exemption" or determines that "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A); *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (noting that this requirement "imposes an independent and meaningful burden on agencies" to "articulate both the nature of the harm from release and the link between the specified harm and specific information contained in the material withheld") (citations omitted).  So § 7.23(d)—like § 7.23(b) and FOIA itself—*prohibits* certain information from being withheld, but does not *require* any information to be withheld.  Because the agency concluded that the redacted information in the NOPV did not fall under any FOIA exemption, it did not need to address these provisions.  *See* Compl. Ex. T at 7 n.6.  But even if the information *were* covered by an exemption, Sunoco could not prevail in this action without identifying some law *prohibiting* disclosure.  Section 7.23(d) is not that law.

C.F.R. § 190.343(b); Pl.'s Opp'n at 16–17.  Because Sunoco does not plausibly allege that disclosure of the unredacted NOPV is contrary to any regulation (or any other law), it has failed to state an actionable reverse-FOIA claim under the APA.

## II.   The risk-analysis data at issue does not fall within a FOIA exemption.

Even if Sunoco could proceed under FOIA through the APA, it fails to plausibly allege that the risk-analysis data in the NOPV—general information about the possible consequences of a pipeline rupture that does not identify any particular points of vulnerability— falls with FOIA exemption 7(F) or exemption 4.  Sunoco's complaint should be dismissed.

### A.   The general risk-analysis data redacted in the NOPV does not fall within FOIA's exemption 7(F) because it could not reasonably be expected to endanger any individual.

As Defendants previously explained, Sunoco's reverse-FOIA claim fails because it does not plausibly allege that the risk-analysis data currently redacted in the NOPV "could reasonably be expected to endanger the life or physical safety of any individual."[9]  Defs.' Mot. at 11–12 (citing 5 U.S.C. § 552(b)(7)(F)).  That's because the redacted information at issue

---

[9] At the outset, it should be noted that Sunoco misunderstands the relevant inquiry by arguing that Defendants' "Motion to Dismiss attempts to justify PHMSA's decision with respect to Exemption 7(F) on a *new* basis."  Pl.'s Opp'n at 10–12, 17.  Reverse-FOIA claims are reviewable only because, when some law *prohibits* disclosure, a plaintiff may challenge the agency's disclosure on the grounds that it "is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)."  *Chrysler*, 441 U.S. at 318–19; *Widnall*, 57 F.3d at 1164 (same); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 966 n.33 (D.C. Cir. 1982) (same); *Charles River*, 519 F.2d at 942 (explaining that it is necessarily "an abuse of discretion for an agency to ignore such a statutory mandate and release the information"); *see* Defs.' Mot. at 5–6.  For such review, a motion to dismiss "presents no factual allegations, but rather only arguments about the legal conclusions to be drawn about the agency action."  *Feng Wang v. Pompeo*, 2020 WL 1451598, at *2–3 (D.D.C. Mar. 25, 2020) (Chutkan, J.) (citation and alterations omitted); *see also Alphapointe v. Dep't of Veterans Affairs*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020).  In any event, Defendants' motion echoed the agency's rationale.  *See* Compl. Ex. T at 8 ("PHMSA disagrees that release of this information would endanger the life or physical safety of any individual."); *id.* at 6 ("PHMSA finds that release of information of general applicability to the entire pipeline does not provide specific targeting information that could be used by a potential bad actor.").

here—the maximum distance to the lower flammable limit, the maximum predicted distance to thermal radiation consequences, and the maximum predicted spill extent—"is general in nature and does not identify any particular areas of weakness or points of vulnerability." *Id.* (quoting Compl. Ex. T at 6; Defs.' Mot. Ex. 1 at 4–5). While this information indicates that points *somewhere* along the pipeline have a certain distance to the lower flammable limit, a certain distance to thermal-radiation consequences, and certain predicted spill extents, the unredacted NOPV says nothing about *where* along the approximately 350-mile pipeline those points are located, and therefore "does not provide specific targeting information that could be used by a potential bad actor." *Id.* (quoting Compl. Ex. T at 6).

Sunoco responds by again conflating the general pipeline-rupture information redacted from the NOPV with the underlying Stantec reports, which provide much more detailed risk-analysis data about a potential pipeline rupture. As with its complaint, Sunoco repeatedly relies on the hypothetical disclosure of the underlying "risk consequence modeling data"—that is, the actual Stantec reports themselves—to argue that such disclosure "endangers those living within the immediate vicinity of the ME2 pipeline by enabling bad actors to identify points at which an attack would cause greatest harm." Pl.'s Opp'n at 18; *id.* at 22 (inappositely noting that "the risk consequence modeling data shows the areas of potential harm from a pipeline rupture"); *id.* at 22 (stating the irrelevant proposition that "a terrorist or criminal could use the risk consequence modeling data to determine . . . the likely impact of a rupture at any point along the pipeline"); *id.* at 22 n.14 (attempting to distinguish cases by arguing that "[t]he information in those cases is indistinguishable from the risk consequence modeling data"); Compl. ¶ 1 (expressing concern about "the risk consequence modeling results bec[oming] publicly available," rather than the disclosure of the general redacted data in the NOPV); *id.* ¶¶ 53, 55–56, 64 (decrying the release of the "results of Stantec's risk assessments"). But as Defendants already explained, the agency has determined to release only the few lines of generalized distances redacted from the 10-page NOPV, and that is the only risk-analysis data at issue here. Defs.' Mot. at 11–12 (citing Compl. at 22).

That is not "read[ing] the Complaint too narrowly," Pl.'s Opp'n at 18; it is just reading the complaint. *See Iqbal*, 556 U.S. at 678 (holding that a complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement" (citation and alterations omitted)); *Segrest v. Franklin Am. Mortg. Co.*, 2013 WL 12392538, at *1 (W.D. Tex. May 14, 2013) ("Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead specific facts, not mere conclusory allegations." (citations omitted)). And even a cursory examination of the NOPV shows that there is no information—either redacted or unredacted—that "provides 'specific' zones (down to distance in feet) and exact populations where a pipeline rupture would cause the greatest impact at any point along the pipeline route, including the extent of casualty and damage at various ranges."[10] Pl.'s Opp'n at 19; *see* Defs.' Mot. Ex. 1.

Tellingly, Sunoco asserts that the NOPV provides this specific information without any actual support. It cites only two paragraphs of the complaint and one of the complaint's exhibits, none of which point to any specific information in the NOPV. Pl.'s Opp'n at 19 (citing Compl. ¶¶ 1, 22, Ex. J at 3–4). To the contrary, those cursory references only further demonstrate that Sunoco is improperly attempting to conflate the detailed information in the underlying Stantec reports with the general pipeline-rupture information redacted from the NOPV. *See* Compl. ¶ 1 (noting that the "specific results of risk assessment and consequence modeling," not the general information redacted from the NOPV, "identified those areas along the ME2 pipeline that would be most impacted by a potential pipeline rupture"); *id.* ¶ 22 (stating that "the results of risk consequence modeling," not the general information redacted from the NOPV, "provide a roadmap for anyone intending to damage the pipeline and/or harm the surrounding community"); Compl. Ex. J (same). But no amount of obfuscation can hide the fact that all information redacted in the NOPV "is general in nature and

---

[10] Given the complete absence of any such information in the NOPV, Defendants assume that Sunoco is again referencing the underlying Stantec reports themselves, not information in the NOPV. *See generally* Defs.' Mot. Ex. 1.

does not identify any particular areas of weakness or points of vulnerability." Compl. Ex. T. at 6; *see* Defs.' Mot. Ex. 1.

The same goes for Sunoco's attempted analogies. For example, Sunoco claims that the agency "redacts 'Worse Case Discharge' information similar to risk consequence data from Facility Response Plans." Pl.'s Opp'n at 21. But the similarity of worst-case-discharge information—data about "the largest foreseeable discharge of oil" from an oil pipeline—to "risk consequence data" in the underlying Stantec reports is beside the point. Unlike the *general* pipeline-rupture information at issue here, the agency withholds worst-case-discharge information because it indicates "volume and location," which "could be used to rank desirable targets." Compl. Ex. A at 1. Similarly, Sunoco emphasizes that Pennsylvania Public Utility Commission "has consistently rejected public requests for the risk consequence modeling data." Pl.'s Opp'n at 22–23. But that again references the underlying Stantec reports, not the general distances redacted in the NOPV. *See* Compl. Exs. B & C at 2 (the Commission's denial of a request for three "Hazard Assessment" reports submitted by Sunoco).[11]

The parties certainly agree that *specific* infrastructure information may satisfy FOIA's exemption 7(F) in certain circumstances. Defs.' Mot. at 11–12; Pl.'s Opp'n at 21–22. But, unlike Sunoco's cited cases, that's not what we have here. *Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 206 (D.C. Cir. 2014) ["*PEER*"] (explaining that "the inundation maps fall comfortably within Exemption 7(F)" because "disclosing the maps would give anyone seeking to cause harm the ability to deduce the zones and populations most affected by dam failure" (quotation marks omitted)); *Standing Rock*

---

[11] Sunoco cannot rely on correspondence with FOIA requesters (attached to its brief) to defeat Defendants' motion because those documents were not referenced in, or attached to, the complaint. Pl.'s Opp'n at 18 n.11; *see* Def.'s Mot. at 4 (legal standards). Regardless, the FOIA requesters' professed need for submitting their FOIA requests says nothing about the few lines of general distances redacted from the NOPV.

*Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 518, 522–23 (D.D.C. 2017) (concluding that spill-model discussions—which "pinpoint[ed] locations where intentional damage to an oil pipeline would generate the greatest harm"—would be protected under exemption 7(F) because they were "much like the inundation maps described in *PEER*"); *Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1321 (D. Utah 2003) (holding that inundation maps of the Hoover Dam fall within exemption 7(F) because, among other reasons, terrorists could use them "to estimate the extent of flooding that would be occasioned by attacking individual features of the dam"). Again, the generalized distances redacted from the NOPV certainly do not allow "a terrorist or criminal" to "determine whether attacking a pipeline would be worthwhile, which pipeline would provide the most attractive target, and the likely impact of a rupture at any point along the pipeline." *Contra* Pl.'s Opp'n at 22. As the agency explicitly determined, the general distances redacted in the NOPV "do[] not provide specific targeting information that could be used by a potential bad actor" and "do[] not provide any information that would make Sunoco's Mariner East 2 pipeline a more attractive target than similar [ ] pipelines."[12] Compl. Ex. T. at 6–7. Indeed, the NOPV's redacted information could be approximated "using standard calculations based on the well-known physical properties of the natural gas liquids . . . being transported." *Id.* at 7.

Especially in light of the "generally deferential posture when [courts] must assess national security harms," *PEER*, 740 F.3d at 205, Sunoco cannot survive a motion to dismiss by mischaracterizing the complaint's allegations and the NOPV. In fact, the *Standing Rock*

---

[12] Sunoco spills much ink arguing that "Exemption 7(F) contains no exception for information which may have potential benefits." Pl.'s. Opp'n at 20–23. But the agency did not rely on the benefits of disclosure or employ a balancing test to determine *whether* exemption 7(F) applies. *See* Compl. Ex. T at 8 (rejecting the application of exemption 7(F) because the risk-analysis data in the NOPV "does not endanger the life or safety of any individual"). Instead, the agency determined that "any harm attributable to release of this type of information is considerably outweighed by the benefit to the public at-large from being able to better plan emergency response" in the context of concluding that it "would make a discretionary release *even if* Exemption 7 applied." Compl. Ex. T at 8 (emphasis added).

court—cited approvingly by Sunoco—declined to protect information where the agency's Pre-paredness, Emergency Support, and Security Division "saw no reason PHMSA would re-dact" it. *Standing Rock Sioux Tribe*, 249 F. Supp. 3d at 523; Pl.'s Opp'n at 21. That's the same division of the agency that found the risk-analysis data currently redacted in the NOPV "does not identify any particular areas of weakness or points of vulnerability" and "does not provide specific targeting information that could be used by a potential bad actor." Compl. Ex. T at 6–7 & n.4. Because the risk-analysis data currently redacted in the NOPV "is general in nature," *id.* at 6, it could not "reasonably be expected to endanger the life or physical safety of any individual" and is therefore outside FOIA's exemption 7(F). 5 U.S.C. § 552(b)(7)(F).

**B.    The pipeline-rupture data is not "commercial" information within the meaning of FOIA's exemption 4.**

The general risk-analysis data about the possible consequences of a pipeline rupture is also outside FOIA's exemption 4 because it is not "commercial" information. Defs.' Mot. at 7–11. "The terms in Exemption 4 are to be given their ordinary meanings, and information is 'commercial' under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Id.* at 7–8 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002)); Pl.'s Opp'n at 24 (citing the same). The parties agree that the risk-analysis data is not "commercial [in] nature" and therefore falls outside the "core" of this definition. *See* Defs.' Mot. at 8; Pl.'s Opp'n at 27–29 (not arguing that the risk-analysis data is of a "commercial nature"); *Intell. Prop. Watch v. U.S. Trade Representative*, 134 F. Supp. 3d 726, 744 (S.D.N.Y. 2015) ("Whatever 'commercial or financial' means at the margins, at its core are records that reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business." (indirectly quoting *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). Instead, Sunoco trains its sights on the margins, arguing that information "serves a commercial function"—and thus counts as "commercial" under exemption 4—whenever a

company has a "commercial interest" in the information such that its release could materially affect the company's "commercial fortunes." *See* Pl.'s Opp'n at 24.

To meet this limitless test, the company asserts two primary "commercial interests." First, "[d]isclosure of the data directly threatens the security of the pipeline and surrounding communities by helping bad actors identify the most vulnerable areas," which "implicates Sunoco's commercial interests in the safe transportation of products in Pennsylvania and in interstate commerce." *Id.* at 27 (internal quotation marks omitted). Second, the data is "instrumental" in "securing Sunoco's regulatory approvals for the ME2 pipeline" because "it is foreseeable that third parties could seek to use the protected information to contest or unnecessarily delay state or federal approvals for its projects." *Id.* at 28. Sunoco is wrong about the legal framework and, in any event, its asserted "commercial interests" fail on their own terms.

### 1. The pipeline-rupture data is not "commercial" information under the proper legal framework.

Sunoco's improper focus on the "commercial fortunes" implicated by the potential disclosure of information would effectively eliminate any limit on the statutory term "commercial." Surely a company's employees, for example, are integral to its "commercial fortunes," especially if revealing their identities could enable competitors to poach those employees. Pl.'s Opp'n at 24. But courts have typically rejected the idea that employee lists—even those containing job responsibilities and contact information—are "commercial" information within the meaning of exemption 4. *Besson v. U.S. Dep't of Com.*, 480 F. Supp. 3d 105, 112–13 (D.D.C. 2020) (collecting cases). Likewise, a weather report indicating that a tornado will strike Sunoco's pipeline would present the same consequences for Sunoco's "commercial fortunes" that it now asserts: "the greatest possible harm and destruction to the ME2 pipeline and the surrounding communities, an existential risk to its commercial operations." Pl.'s Opp'n at 28 (quoting Compl. ¶ 65). But would anyone seriously contend that a weather report, even if provided to the government in confidence, is "commercial" information? Surely not. "The mere fact that an event occurs," or may occur, "in connection with a commercial

operation does not automatically transform documents regarding that event into commercial information." *Chicago Trib. Co. v. FAA*, 1998 WL 242611, at *2 (N.D. Ill. May 7, 1998).[13]

Contrary to Sunoco's expansive reading, the key distinction in this area is between (a) factual information external to a company's operations, and (b) information related to the company's business, including its "business strategy or capabilities." *Besson*, 480 F. Supp. 3d at 113; *Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (explaining that information must be commercial "*in and of itself*" to fall within exemption 4 (emphasis added)); *see* Def.'s Mot. at 9–10. That's why "factual information regarding the nature and frequency of in-flight medical emergencies," *Chicago Trib.*, 1998 WL 242611, at *3, a company's work plan that that "do[es] not elaborate on [a company's] business or describe its competitive landscape," *100Reporters LLC v. U.S. Dep't of Just.*, 316 F. Supp. 3d 124, 141 (D.D.C. 2018), and customer complaints, *New York Times Co. v. U.S. Food & Drug Admin.*, --- F. Supp. 3d ---, 2021 WL 1178126, at *9 (S.D.N.Y. Mar. 29, 2021), are not considered "commercial" information. They all present factual information external to a company's operations, not information related to the company's business. Conversely, that's why "letters describ[ing] favorable market conditions for domestic [lumber] companies," *Baker & Hostetler*, 473 F.3d at 320, "a non-profit organization's reports describing the operations of its members' nuclear power plants," *id.* (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987))), and "a

---

[13] Although Sunoco seeks to discredit *Chicago Tribune* as "dated out-of-circuit precedent," Pl.'s Opp'n at 26, that case largely applied D.C. Circuit law to correctly find that information about medical emergencies on airline flights is not "commercial." *See Chicago Trib. Co. v. FAA*, 1998 WL 242611, at *2 (N.D. Ill. May 7, 1998). And courts in this jurisdiction have cited *Chicago Tribune* approvingly, never questioning its validity. *See, e.g.*, *Pub. Citizen Found. v. U.S. Dep't of Labor*, 2020 WL 9439355, at *7 (D.D.C. June 23, 2020) (distinguishing the facts of *Chicago Tribune* but not questioning its soundness); *Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 100 (D.D.C. 2013) (citing *Chicago Tribune* approvingly); *Comptel v. FCC*, 945 F. Supp. 2d 48, 57 (D.D.C. 2013) (same).

company's "internal classifications and analysis of [customer] complaints," *New York Times*, 2021 WL 1178126, at *9, are considered "commercial" information.  They all include information related to the company's business, like its "business strategy or capabilities."[14]  *Besson*, 480 F. Supp. 3d at 113.

Using this proper framework, it is clear that the pipeline-rupture information redacted from the NOPV is not "commercial."  This information reveals nothing about Sunoco's business, including its business strategy or capabilities.  *See* Defs.' Mot. at 9.  It is instead factual information, external to Sunoco's operations, describing the potential consequences of a pipeline rupture.  *See id.* at 2–3; Section II.A., *supra*.  Indeed, the agency explained that "this type of information is already in the public domain and any person can derive similar results using standard calculations based on the well-known physical properties of the natural gas liquids, mainly comprised of propane and butane, being transported."  Compl. Ex. T at 7.  "For example, inputting limited pipeline variables into a publicly-available software product allows any person to calculate similar thermal radiation consequences."  *Id.*  As one organization

---

[14] While the cases discussing "commercial fortunes" lack ideal clarity, they are best read to indicate that, when information related to the company's business is disclosed, a company's "commercial fortunes" may be "materially affected."  *See Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006).  In other words, an impact on a company's "commercial fortunes" is the effect of the "commercial" test being met, not the test itself.  So in *Critical Mass*, for example, a non-profit organization's reports describing the operations of its members' nuclear power plants was "commercial" information because the reports revealed "details of the operations of the[] nuclear power plants," even though "the commercial fortunes of [ ] member utilities . . . could be materially affected."  *See Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987).  Similarly, "letters describ[ing] favorable market conditions for domestic [lumber] companies" were considered "commercial" because they revealed information about the companies' business strategy, even though their disclosure "would help rivals to identify and exploit those companies' competitive weaknesses."  *Baker & Hostetler*, 473 F.3d at 320.  Sunoco cites no case in which a court held that information not *itself* commercial becomes "commercial" solely because its disclosure would affect "commercial fortunes."  *Contra Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (explaining that information must be commercial "*in and of itself*" to fall within exemption 4 (emphasis added)).

put it, "[m]odeling such impacts is a matter of materials and physics, and has nothing to do with proprietary trade secrets." *Id.* at 7 n.5.

Because the risk-analysis data about the potential consequences of a pipeline rupture is not "commercial" information within the meaning of exemption 4, Sunoco's APA claim fails. Holding otherwise by applying Sunoco's boundless framework would contravene the D.C. Circuit's admonition that "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

## 2. Sunoco's purported "commercial interests" fail on their own terms.

Even under Sunoco's own legal framework, though, it fails to plausibly allege that it has a "commercial interest" in the redacted pipeline-rupture information.

Sunoco first argues that "[d]isclosure of the data directly threatens the security of the pipeline and surrounding communities by helping bad actors identify the most vulnerable areas," which "implicates Sunoco's commercial interests in the safe transportation of products in Pennsylvania and in interstate commerce." Pl.'s Opp'n at 27. But this again erroneously conflates the detailed risk-analysis data in the underlying Stantec reports with the few lines of generalized distances redacted from the NOPV. The latter—all that is at issue here— "does not provide specific targeting information that could be used by a potential bad actor." *See* Section II.A., *supra* (quoting Compl. Ex. T at 6). So Sunoco has not plausibly alleged that its "commercial interest[s]" are affected.

Sunoco next contends that it has a "commercial interest" because the data is "instrumental" in "securing Sunoco's regulatory approvals for the ME2 pipeline." Pl.'s Opp'n at 28 (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290). For starters, there is no mention of regulatory approvals, or the "instrumental nature" of the risk-analysis data, anywhere in the complaint. *See* Compl. ¶¶ 1–68. The closest Sunoco comes is its allegation that "Sunoco uses the information contained in Stantec's hazard analyses to develop its Integrity Management Plan," and "[t]hese plans are required under federal pipeline safety regulations." Compl. ¶ 20;

*see also* ¶¶ 52, 64 (alleging that without "the results of Stantec's risk consequence modeling," Sunoco "would be unable to comply with the federal pipeline safety requirements or operate the ME2 pipeline"). But that allegation relates only to the detailed risk-analysis data in the underlying Stantec reports, not the generalized distances redacted from the NOPV. Nothing in the complaint remotely suggests that the risk-analysis data at issue is instrumental "in securing Sunoco's regulatory approvals for the ME2 pipeline." *Compare* Pl.'s Opp'n at 28 *with* Compl. ¶¶ 1–68.

Sunoco's theory—that it has a "commercial interest" in the risk-analysis data at issue because the data is somehow "instrumental" in "securing Sunoco's regulatory approvals for the ME2 pipeline"—also contradicts governing law. Pl.'s Opp'n at 28. The company asserts that "it is foreseeable that third parties could seek to use the protected information to contest or unnecessarily delay state or federal approvals for its projects." Pl.'s Opp'n at 28. In other words, Sunoco is worried that the public will present factual safety information to regulators that must make safety decisions about the pipeline. So Sunoco seems to be arguing that its "commercial interest" in securing "regulatory approvals" hinges on the *nondisclosure* of the pipeline-rupture information, not on the pipeline-rupture information itself. But that is the opposite of the "commercial interest" endorsed by the D.C. Circuit in *Health Research Group*, where companies had a "commercial interest" in "documentation of the health and safety experience of their products" because *that information* was "instrumental in gaining marketing approval." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290. Sunoco cites no case holding that *nondisclosure* of information—rather than the information itself—can constitute a cognizable "commercial interest" in the context of gaining regulatory approval. And that makes sense, as the D.C. Circuit has held that information must be commercial "in and of itself" to fall within exemption 4. *Nat'l Ass'n of Home Builders*, 309 F.3d at 38.

Even if Sunoco's improper legal framework for "commercial" information is applied, the company's arguments fail on their own terms. Because Sunoco has not plausibly alleged

24

that the pipeline-rupture information is "commercial" with the meaning of exemption 4, its APA claim fails.

## CONCLUSION

For the reasons explained above and in Defendants' motion, Sunoco fails to state a claim.  The Court should therefore dismiss Sunoco's complaint with prejudice.

DATED: November 5, 2021                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General

                                           MARCIA M. BERMAN
                                           Assistant Director, Federal Programs Branch

                                           */s/ Stephen Ehrlich*
                                           STEPHEN EHRLICH
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, NW
                                           Washington, DC 20005
                                           Phone:  (202) 305-9803
                                           Email:  stephen.ehrlich@usdoj.gov

                                           *Attorneys for Defendants*