# Exhibit 1

**Department of Justice Guide to the Freedom of Information Act**



# Exemption 4

Exemption 4 of the FOIA protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."[1]  This exemption is intended to protect the interests of both the government and submitters of information.[2]  The exemption covers two distinct categories of information in federal agency records:  (1) trade secrets; and (2) information that is (a) commercial or financial, and (b) obtained from a person, and (c) privileged or confidential.[3]

## Trade Secrets

For the purposes of Exemption 4, the Court of Appeals for the District of Columbia Circuit has adopted a "common law" definition of the term "trade secret" that is narrower than the broad definition used in the Restatement of Torts.[4]  The D.C. Circuit's decision in Public Citizen Health Research Group v. FDA was a departure from what until then had been almost universally accepted by the courts – that a "trade secret" encompasses virtually any information that provides a competitive advantage.  In Public Citizen Health Research Group v. FDA, a "trade secret" was more narrowly defined as "a secret,

---

[1] 5 U.S.C. § 552(b)(4) (2012 & Supp. V 2017).

[2] See Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356, 2366 (2019) (opining that "when Congress enacted FOIA it sought a 'workable balance' between disclosure and other governmental interests – interests that may include providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work").

[3] See 5 U.S.C. § 552(b)(4).

[4] Compare Pub. Citizen Health Research Grp. v. FDA, 704 F.2d 1280, 1284 n.7, 1288 (D.C. Cir. 1983) (constructing "trade secret" definition that more closely aligns with legislative intent of FOIA), with Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939) (explaining that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it").

commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort."[5]  This definition also incorporates a requirement that there be a "direct relationship" between the trade secret and the productive process.[6]

    The Court of Appeals for the Tenth Circuit has expressly adopted the D.C. Circuit's narrower definition of the term "trade secret," finding it "more consistent with the policies behind the FOIA than the broad Restatement definition."[7]  In so doing, the Tenth Circuit noted that adoption of the broader Restatement definition "would render superfluous" the second category of Exemption 4 information "because there would be no category of information falling within the latter" category that would be "outside" the reach of the trade secret category.[8]  Like the D.C. Circuit, the Tenth Circuit was "reluctant to construe the FOIA in such a manner."[9]  In a later case the Tenth Circuit declined to "address whether [it] should supplement" this narrower trade secret definition "to require a governmental showing that the documents in question are actually owned by the submitting entity or by any other party," finding that in the case before it, involving plans and specifications for an antique aircraft, the agency had shown a "corporate 'chain-of-ownership'" for the requested documents, leading from "the original owner and submitter" to the company currently claiming "trade secret" protection for them.[10]

---

[5] 704 F.2d at 1288; see also Henson v. HHS, No. 14-908, 2017 WL 1090815, at *5 (S.D. Ill. Mar. 23, 2017) (finding that Exemption 4 was "appropriate" to prevent disclosure of "raw material used in [a] manufacturing process[] [and] raw material used in [a] testing process," which "constitute[d] trade secrets"); Freeman v. Bureau of Land Mgmt., 526 F. Supp. 2d 1178, 1188-89 (D. Or. 2007) (concluding that trade secrets are not limited to processes "actually proven to be 'commercially valuable'"; rather, it was sufficient for plaintiff to show that his manufacturing process "may" have commercial value); Appleton v. FDA, 451 F. Supp. 2d 129, 142 & n.8 (D.D.C. 2006) (rejecting plaintiff's argument that trade secret, as defined in Public Citizen, requires "sole showing of 'innovation or substantial effort,'" and emphasizing that trade secret applies to information that "constitutes the 'end product of either innovation or substantial effort'" (quoting Pub. Citizen Health Research Grp., 704 F.2d at 1288)).

[6] Pub. Citizen Health Research Grp., 704 F.2d at 1288; accord Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 244 F.3d 144, 150-51 (D.C. Cir. 2001) (reiterating the Public Citizen definition and emphasizing that it "narrowly cabins trade secrets to information relating to the 'productive process' itself").

[7] Anderson v. HHS, 907 F.2d 936, 944 (10th Cir. 1990).

[8] Id.

[9] Id.

[10] Herrick v. Garvey, 298 F.3d 1184, 1191 (10th Cir. 2002) (declaring that the agency "need not show" that "ownership of these particular documents was specifically mentioned and transferred" with each corporate succession because "such a requirement would be overly

Trade secret protection has been recognized for product manufacturing and design information,[11] but it has been denied for general information concerning a product's physical or performance characteristics or a product formula when release would not reveal the actual formula itself.[12] Moreover, one appellate court has concluded that "where the submitter or owner of documents held by the government grants the government permission to loan or release those documents to the public, those

---

burdensome," and finding that the agency "need only show that there was a corporate successor that received the assets of the prior corporation").

[11] See, e.g., Rozema v. HHS, 167 F. Supp. 3d 324, 327 (N.D.N.Y. 2016) ("quantities of menthol contained in cigarettes 'by brand and by quantity in each brand and subbrand'"); Appleton, 451 F. Supp. 2d at 141 n.7 ("drug product manufacturing information, including manufacturing processes or drug chemical composition and specifications"); Herrick v. Garvey, 200 F. Supp. 2d 1321, 1326 (D. Wyo. 2000) ("'technical blueprints depicting the design, materials, components, dimensions and geometry of'" aircraft first manufactured in 1935 (quoting agency declaration)), aff'd, 298 F.3d 1184, 1190 n.3 (10th Cir. 2002) (noting requester's concession at oral argument that blueprints remained commercially valuable); Heeney v. FDA, No. 97-5461, 1999 WL 35136489, at *7 n.13 (C.D. Cal. Mar. 16, 1999) ("compliance testing" and "specification of the materials used in constructing" electrode catheter), aff'd, 7 F. App'x 770 (9th Cir. 2001); Citizens Comm'n on Human Rights v. FDA, No. 92-5313, 1993 WL 1610471, at *7 (C.D. Cal. May 10, 1993) ("information about how a pioneer drug product is formulated, chemically composed, manufactured, and quality controlled"), aff'd in part & remanded in part on other grounds, 45 F.3d 1325 (9th Cir. 1995); Pac. Sky Supply, Inc. v. Dep't of the Air Force, No. 86-2044, 1987 WL 25456, at *1 (D.D.C. Nov. 20, 1987) (design drawings of airplane fuel pumps developed by private company and used by Air Force), modifying No. 86-2044, 1987 WL 18214 (D.D.C. Sept. 29, 1987), on motion to amend judgment, No. 86-2044, 1987 WL 28485 (D.D.C. Dec. 16, 1987); cf. Myers v. Williams, 819 F. Supp. 919, 921 (D. Or. 1993) (granting preliminary injunction to prevent FOIA requester from disclosing chemical formula trade secret information acquired through mistaken, but nonetheless, official FOIA release) (non-FOIA case). But see Physicians Comm. for Responsible Med. v. NIH, 326 F. Supp. 2d 19, 23 (D.D.C. 2004) (denying trade secret protection for "noncommercial scientist's research design" because scientists are not generally engaged in trade or commerce and because "scientist's research design is not literally a trade secret or item of commercial information" (quoting Wash. Research Project, Inc. v. HEW, 504 F.2d 238, 244-45 (D.C. Cir. 1974))).

[12] See Ctr. for Auto Safety, 244 F.3d at 151 (finding that airbag characteristics relating "only to the end product – what features an airbag has and how it performs – rather than to the production process" do not qualify as trade secrets); Freeman, 526 F. Supp. 2d. at 1188 (determining that quantity and quality of ore reserve is not trade secret); Nw. Coal. for Alternatives to Pesticides v. Browner, 941 F. Supp. 197, 201-02 (D.D.C. 1996) (ruling that "common names and Chemical Abstract System (CAS) numbers of the inert ingredients" contained in pesticide formulas do not disclose ingredient's trade name and do not qualify for Exemption 4 protections).

3

documents are no longer 'secret' for purposes of [trade secret protection under] Exemption 4" and so must be released.[13]

## Commercial or Financial Information

If information does not qualify as a trade secret, it nonetheless may be protected pursuant to Exemption 4 if it falls within its second, much larger category. To be protected as such, the information must be commercial or financial, obtained from a person, and privileged or confidential.[14] The overwhelming majority of Exemption 4 cases focus on this standard.

Courts have little difficulty in regarding information as "commercial or financial" if it relates to business or trade.[15] The Court of Appeals for the District of Columbia Circuit

---

[13] Herrick, 298 F.3d at 1194, n.10 (distinguishing facts of the case before it, and upholding trade secret protection nonetheless, based upon the subsequent revocation of that permission and the requester's failure to challenge both whether such revocation could legally operate to "restore the secret nature of the documents" and, if so, whether such revocation could properly be made after the documents had been requested under the FOIA).

[14] See, e.g., Pub. Citizen Health Research Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983); Herrick v. Garvey, 200 F. Supp. 2d 1321, 1324 (D. Wyo. 2000), aff'd, 298 F.3d 1184, 1193-95 (10th Cir. 2002).

[15] See, e.g., 100Reporters LLC v. DOJ, 248 F. Supp. 3d 115, 136 (D.D.C. 2017) (finding that annual report information, including summarized presentations and materials describing "specific transactions, projects, bids, and business partners" as well as "work plans and related" material were commercial in nature because they involved business operations); Forest Cnty. Potawatomi Cmty. v. Zinke, 278 F. Supp. 3d 181, 200 (D.D.C. 2017) (concluding that information related to establishing a casino was "commercial 'in its function,' as the [tribe has] 'a commercial interest at stake in its disclosure'"); Elec. Privacy Info. Ctr. v. DHS, 117 F. Supp. 3d 46, 62-63 (D.D.C. 2015) (holding that identities of corporations participating in pilot security program were exempted from release because "[t]he identities of which companies have participated in [the program], if disclosed, could have a commercial or financial impact on the companies involved"); San Juan Citizens All. v. U.S. Dep't of Interior, 70 F. Supp. 3d 1214, 1219 (D. Colo. 2014) (determining that email address of client who hired submitter to act as land lease broker to protect identity of client, was exempted from release because "[e]nsuring client confidentiality by conducting its leasing efforts in a discrete manner is an integral aspect of the services [the submitter] provides"); Waterkeeper All. v. U.S. Coast Guard, No. 13-289, 2014 WL 5351410, at *15 (D.D.C. Sept. 29, 2014) (determining that information related to "oil and gas leases, prices, quantities and reserves" is commercial in nature); Pub. Citizen Health Research Grp. v. HHS , 975 F. Supp. 2d 81, 105 (D.D.C. 2013) (finding information related to business-related processes, decisions, and conduct  to be "sufficiently commercial" to benefit from Exemption 4); Dow Jones Co. v. FERC, 219 F.R.D. 167, 176 (C.D. Cal. 2003) (finding that information relating "'to business decisions and practices regarding the sale of power, and the operation and maintenance'" of generators was commercial and financial in nature)

has held that these terms should be given their "ordinary meanings" and has specifically rejected the argument that the term "commercial" be confined to records that "reveal basic commercial operations," holding instead that records are commercial so long as the submitter has a "commercial interest" in them.[16]

---

(quoting agency declaration); Merit Energy Co. v. U.S. Dep't of the Interior, 180 F. Supp. 2d 1184, 1188 (D. Colo. 2001) ("Information regarding oil and gas leases, prices, quantities and reserves is obviously commercial in nature."); In Def. of Animals v. HHS, No. 99-3024, 2001 WL 34871354, at *2, *8 (D.D.C. Sept. 28, 2001) (withholding portions of letter detailing "financial situation" of private primate research facility); ISC Group, Inc. v. DOD, No. 88-0631, 1989 WL 168858, at *2-3 (D.D.C. May 22, 1989) (finding investigative report concerning allegations of overcharging on government contract to be financial information exempted from release); M/A-COM Info. Sys. v. HHS, 656 F. Supp. 691, 692 (D.D.C. 1986) (determining that Exemption 4 claim relating to disbarment settlement negotiation documents reflecting "accounting and other internal procedures" was valid because there was a commercial interest in those materials).

[16] Pub. Citizen Health Research Grp., 704 F.2d at 1290 (citing Wash. Post Co. v. HHS, 690 F.2d 252, 266 (D.C. Cir. 1982) and Bd. of Trade v. Commodity Futures Trading Comm'n, 627 F.2d 392, 403 (D.C. Cir. 1980)); accord Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 319-20 (D.C. Cir. 2006) (finding that letters describing "favorable market conditions for domestic [lumber] companies" constituted "commercial information," because those companies "have a 'commercial interest' in such letters") (citing Pub. Citizen Health Research Grp., 704 F.2d at 1290); Tokar v. DOJ, 304 F. Supp. 3d 81, 94 n.3 (D.D.C. 2018) (concluding that information describing how corporation implemented regulatory compliance program was "commercial" because that company had "commercial interest" in such information); Soghoian v. Office of Mgmt. & Budget, 932 F. Supp. 2d 167, 174-75 (D.D.C. 2013) (finding that trade association has "commercial interest" in information reflecting "allocation of costs surely to impact the commercial status and dealings" of its members); Cooper v. U.S. Dep't of the Navy, No. 05-2252, 2007 WL 1020343, at *3-4 (D.D.C. Mar. 30, 2007) (determining that professor had commercial interest in his research, as demonstrated by his filing of patent applications and formation of for-profit company); ICM Registry v. U.S. Dep't of Commerce, No. 06-0949, 2007 WL 1020748, at *7 (D.D.C. Mar. 29. 2007) (holding that professional opinions of telecommunications consultant "clearly constitute commercial material"); Judicial Watch, Inc. v. DOE, 310 F. Supp. 2d 271, 308 (D.D.C. 2004) (holding that because reports "constitute work done for clients," they are "'commercial' in nature"), aff'd in part & rev'd in part on other grounds, 412 F.3d 125 (D.C. Cir. 2005); Flathead Joint Bd. of Control v. U.S. Dep't of the Interior, 309 F. Supp. 2d 1217, 1221 (D. Mont. 2004) (declaring that "water rights themselves are an object of commerce . . . that is bought and sold" and holding that "information about the quantity available" or "information that creates the Tribes' negotiating position, supports their claims" or maximizes their position "is all commercial information in function"); Starkey v. U.S. Dep't of Interior, 238 F. Supp. 2d 1188, 1195 (S.D. Cal. 2002) (concluding that "well and water related information" on an Indian reservation is "commercial or financial in nature" because "'water is a precious, limited resource'" and disclosure "'would adversely affect the Band's ability to negotiate its water rights or to litigate that issue'" (quoting agency declaration)); Judicial Watch, Inc. v. Exp.-Imp. Bank, 108 F. Supp. 2d 19, 28 (D.D.C. 2000)

5

In an early case addressing this element of Exemption 4, which involved a request for employee authorization cards submitted by a labor union, the Court of Appeals for the Second Circuit articulated a straightforward definition of the term "commercial," declaring that "surely [it] means [anything] pertaining or relating to or dealing with commerce."[17] In doing so, it categorically rejected the requester's argument that the information was "not commercial or financial because the [labor union did] not have profit as its primary aim."[18] The Second Circuit declared that such an "interpretation [would give] much too narrow a construction to the phrase in question."[19] Instead, the Second Circuit focused on the union's relationship with "commerce" and found that "[l]abor unions, and their representation of employees, quite obviously pertain to or are related to commerce and deal with the commercial life of the country."[20] Accordingly, the employee authorization cards were readily deemed to be "commercial."[21]

The D.C. Circuit has held that a submitter's "nonprofit status is not determinative of the character of the information it reports," holding instead that "information may qualify as 'commercial' even if the provider's . . . interest in gathering, processing, and reporting the information is noncommercial."[22] The First Circuit reasoned similarly, finding that a non-profit organization may possess commercial information, because "[a]ll sorts of non-profits—hospitals, colleges, and even the National Football League—

---

(finding export insurance applications containing detailed information on goods and customers to be "commercial or financial").

[17] Am. Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978).

[18] Id.

[19] Id.

[20] Id.

[21] Id.; see also FlightSafety Servs. v. U.S. Dep't of Labor, No. 3-1285, 2002 WL 368522, at *5 (N.D. Tex. Mar. 5, 2002) (protecting "information relating to the employment and wages of workers"), aff'd per curiam, 326 F.3d 607, 611 (5th Cir. 2003) (citing Hustead v. Norwood, 529 F. Supp. 323, 326 (S.D. Fla. 1981)).

[22] Critical Mass Energy Project v. NRC, 830 F.2d 278, 281 (D.C. Cir. 1987) (finding that health and safety reports submitted by the nonprofit Institute for Nuclear Power Operations were "commercial," because the Institute's "'constituent utility companies [were] assuredly commercial enterprises engaged in the production and sale of electrical power for profit'" and "the commercial fortunes of [those] member utilities . . . could be materially affected by" disclosure (quoting district court)), vacated en banc on other grounds, 975 F.2d 871, 880 (D.C. Cir. 1992) (reiterating that it "agree[d] with the district court's conclusion that the information [contained in the nonprofit Institute's safety reports] is commercial in nature"); see also Sharyland Water Supply Corp. v. Block, 755 F.2d 397, 398 (5th Cir. 1985) (summarily declaring that audit reports submitted by nonprofit water supply company "clearly are commercial or financial").

engage in commerce as that term is ordinarily understood[;]" "how the tax code treats income from that commerce is a separate issue that has no bearing on our inquiry here."[23]

Despite the widely accepted breadth of the term "commercial or financial," the District Court for the District of Columbia has held that the burden is on the government to demonstrate that this element is satisfied and "merely assert[ing], without any supporting detail" that records contain commercial or financial information is "inadequate."[24] The D.C. Circuit rejected an agency's argument that data pertaining to the location of endangered pygmy owls sightings qualified as "commercial or financial" information "simply because it was submitted pursuant to a government-to-government cooperative agreement" whereby a state agency provided "access to its database in return for money" from the federal government.[25] The D.C. Circuit reasoned that "[s]uch a quid-pro-quo exchange between governmental entities does not constitute a commercial transaction in the ordinary sense."[26] Moreover, the D.C. Circuit found the requested "owl-sighting data itself [was] commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there [was] no evidence that the parties who supplied the owl-sighting information [had] a commercial interest at stake in its disclosure)."[27] Consequently, the D.C. Circuit was "unpersuaded" that Exemption 4 applied.[28]

Similarly, a district court rejected an agency's attempt to convert "factual information regarding the nature and frequency of in-flight medical emergencies"[29] into "commercial information" for purposes of Exemption 4, finding instead that the "medical emergencies detailed in the [requested] documents [did] not naturally flow from commercial flight operations, but rather [were] chance events which happened to occur

---

[23] New Hampshire Right to Life v. HHS, 778 F.3d 43, 50 (1st Cir. 2015).

[24] COMPTEL v. FCC, 945 F. Supp. 2d 48, 57 (D.D.C. 2013) (rejecting as "conclusory" agency's bare assertion that documents were "commercial" or "financial"); see also Animal Legal Def. Fund, Inc. v. Dep't of the Air Force, 44 F. Supp. 2d 295, 303 (D.D.C. 1999) (denying summary judgment when the agency's declaration merely "state[d]" that the company's "proposals contain 'commercial and financial information'" but failed to provide a "description of the documents to permit the [requester] or [the] Court to test the accuracy of that claim").

[25] Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 38 (D.C. Cir. 2002).

[26] Id. at 38-39.

[27] Id. at 39.

[28] Id. at 38.

[29] Chi. Tribune Co. v. FAA, No. 97-2363, 1998 WL 242611, at *3 (N.D. Ill. May 7, 1998).

while the airplanes were in flight."[30]  In delimiting the scope of the term "commercial," the court opined that "[t]he mere fact that an event occurs in connection with a commercial operation does not automatically transform documents regarding that event into commercial information."[31]  Additionally, the District Court for the District of Columbia rejected an intervenor-defendant submitter's broad argument that a company has a commercial interest in "all records that relate to every aspect of the company's trade or business," finding such a construction "plainly incorrect."[32]  The court further found that merely because information could harm a submitter's reputation does not compel the conclusion that the information is "commercial."[33]

Similarly, the District Court for the Southern District of New York held that documents submitted by the General Electric Company (GE) to the EPA supporting GE's alternative Hudson River dredging plan – which would have been less costly to GE than the plan scheduled to be imposed on it by the EPA – were not "commercial" under Exemption 4.[34]  Despite the fact that GE "had a financial stake" in the matter and provided the documents in an effort "to convince the EPA to adopt its less expensive remedy," the court nonetheless held that the EPA had "failed to establish that the information [had] any intrinsic commercial value."[35]

An agency's failure to establish the "commercial" character of requested information precluded Exemption 4 protection in the only appellate court decision to address the protection of information submitted by a scientist in connection with a grant application.[36]  In that case, the D.C. Circuit found that research designs submitted as part of a grant application were not "commercial," despite claims that "[t]heir misappropriation," which "would be facilitated by premature disclosure, [would]

---

[30] Id. at *2.

[31] Id.; In Def. of Animals v. HHS, No. 99-3024, 2001 WL 34871354, at *8 (D.D.C. Sept. 28, 2001) (observing that "identities of [private] Foundation employees . . . standing alone, may not be commercial").

[32] Pub. Citizen Health Research Grp.  v. HHS, 975 F. Supp. 2d 81, 100 (D.D.C. 2013).

[33] Id. at 106-07.

[34] N.Y. Pub. Interest Research Grp. v. EPA, 249 F. Supp. 2d 327, 330, 332-34 (S.D.N.Y. 2003) (describing the documents as containing GE's "analyses of the costs, benefits, and environmental impact associated with the EPA's proposed remedy and GE's alternative remedy").

[35] Id. at 334 (finding also that EPA had not shown "that disclosure would jeopardize GE's commercial interests or reveal information about GE's ongoing operations, or that GE generated the information for a purpose other than advocating a policy to a governmental agency"); see also id. at 330 (noting that GE had neither submitted an affidavit nor "taken a position with regard to the documents").

[36] See Wash. Research Project, Inc. v. HEW, 504 F.2d 238, 244 (D.C. Cir. 1974).

deprive[] [the researcher] of the career advancement and attendant material rewards in which the academic and scientific market deals."[37] Finding that "the reach" of Exemption 4 "is not necessarily coextensive with the existence of competition in any form," the D.C. Circuit declared that "a noncommercial scientist's research design is not literally a trade secret or item of commercial information, for it defies common sense to pretend that the scientist is engaged in trade or commerce."[38] Although recognizing that a scientist may have "a preference for or an interest in nondisclosure of his research design," the D.C. Circuit held that if that interest is "founded on professional recognition and reward, it is surely more the interest of an employee than of an enterprise" and so is beyond the reach of Exemption 4.[39]  Significantly, the D.C. Circuit noted that a given grantee "could conceivably be shown to have a commercial or trade interest in his research design," but it emphasized that "the burden of showing" such an interest "was on the agency."[40] Because the agency "did not introduce a single fact relating to the commercial character of any specific research project," the D.C. Circuit concluded that in that case, the agency had failed to "carr[y] its burden on this point."[41]

Lastly, protection for financial information is not limited to economic data generated solely by corporations or other business entities, but rather has been held to apply to personal financial information as well.[42]

---

[37] Id. (observing that "the government has been at some pains to argue that biomedical researchers are really a mean-spirited lot who pursue self-interest as ruthlessly as the Barbary pirates did in their own chosen field").

[38] Id.

[39] Id. at 245.

[40] Id. at 244 n.6.

[41] Id.; see also Physicians Comm. for Responsible Med., 326 F. Supp. 2d 19, 24-25 (D.D.C. 2004) (concluding "as a matter of law" that a noncommercial scientist's research designs did "not amount to commercial information," after finding that the scientist "never manufactured or marketed any drug . . . that was produced as a result of his research" and that "none of [his] research results have been marketed or used and subsequently subjected to additional study" (citing Wash. Research Project, 504 F.2d at 244)).

[42] See Defenders of Wildlife v. U.S. Dep't of the Interior, 314 F. Supp. 2d 1, 15 (D.D.C. 2004) (finding that draft severance agreements which contained "financial information surrounding [the Deputy Secretary's] separation from his former company . . . are within the common understanding of the term 'financial information'"); see also FOIA Update, Vol. IV, No. 4, at 14.  But see Wash. Post Co. v. HHS, 690 F.2d 252, 266 (D.C. Cir. 1982) (holding that mere "list of non-federal employment" is not "financial" within meaning of Exemption 4).

## **Obtained from a "Person"**

The second of Exemption 4's specific criteria is that the information be "obtained from a person."[43] Under the Administrative Procedure Act (APA), the term "person" refers to individuals as well as to a wide range of entities,[44] and has been found to include corporations, banks, state governments, agencies of foreign governments, and Native American tribes or nations, who provide information to the government.[45] The reach of Exemption 4 is "sufficiently broad to encompass financial and commercial information concerning a third party" and protection is therefore available regardless of whether the information pertains directly to the commercial interests of the party that provided it – as is typically the case – or pertains to the commercial interests of another.[46] The courts have held, however, that information generated by the federal government itself is not

---

[43] 5 U.S.C. § 552(b)(4) (2012 & Supp. V 2017).

[44] 5 U.S.C. § 551(2) (2012 & Supp. V 2017) (defining "person" as "an individual, partnership, corporation, association, or public or private organization other than an agency"); see also, e.g., Nadler v. FDIC, 92 F.3d 93, 95 (2d Cir. 1996) (stating that term "person" includes "'an individual, partnership, corporation, association, or public or private organization other than an agency'" (quoting definition found in Administrative Procedure Act, 5 U.S.C. § 551(2) (2006))); Dow Jones Co. v. FERC, 219 F.R.D. 167, 176 (C.D. Cal. 2003) (same).

[45] See, e.g., FlightSafety Servs. v. U.S. Dep't of Labor, 326 F.3d 607, 611 (5th Cir. 2003) (per curiam) (business establishments); Stone v. Exp.-Imp. Bank, 552 F.2d 132, 137 (5th Cir. 1977) (foreign government agency); Flathead Joint Bd. of Control v. U.S. Dep't of the Interior, 309 F. Supp. 2d 1217, 1221 (D. Mont. 2004) (Indian tribes) (citing Indian Law Res. Ctr. v. U.S. Dep't of the Interior, 477 F. Supp. 144, 146 (D.D.C. 1979)) (holding that an Indian tribe, "as a corporation that is not part of the Federal Government, is plainly a person within the meaning of the Act"))); Lepelletier v. FDIC, 977 F. Supp. 456, 459 (D.D.C. 1997) (banks), aff'd in part, rev'd in part & remanded on other grounds, 164 F.3d 37 (D.C. Cir. 1999); Hustead v. Norwood, 529 F. Supp. 323, 326 (S.D. Fla. 1981) (state government). See generally Merit Energy Co. v. U.S. Dep't of the Interior, 180 F. Supp. 2d 1184, 1189 (D. Colo. 2001) (rejecting Apache Tribe's claim of confidentiality for information "accumulated by the Tribe [pursuant to a cooperative agreement] that would otherwise be submitted by [oil and gas] lessees directly to the agency," and concluding that although the lessees could invoke Exemption 4, the Tribe could not).

[46] Bd. of Trade v. Commodity Futures Trading Comm'n, 627 F.2d 392, 405 (D.C. Cir. 1980) (holding that the "plain language" of Exemption 4 "does not in any way suggest that" the requested information "must relate to the affairs of the provider"), abrogated on other grounds by U.S. Dept. of State v. Wash. Post Co., 456 U.S. 595 (1982); accord Critical Mass Energy Project v. NRC, 830 F.2d 278, 281 (D.C. Cir. 1987) (citing Bd. of Trade and protecting safety reports submitted by power-plant consortium based on commercial interests of member utility companies), vacated en banc on other grounds, 975 F.2d 871 (D.C. Cir. 1992); see, e.g., Miami Herald Publ'g Co. v. SBA, 670 F.2d 610, 614 & n.7 (5th Cir. 1982) (analyzing Exemption 4 argument raised on behalf of borrowers even though no Exemption 4 argument was raised for lenders, who actually had "directly" supplied requested loan agreements to agency).

"obtained from a person" and is therefore excluded from Exemption 4's coverage.[47] Exemption 5 of the FOIA incorporates a qualified privilege for sensitive commercial or financial information generated by the government.[48]  (For a further discussion of the "commercial privilege," see Exemption 5, Other Privileges, below.)

Documents prepared by the government can still come within Exemption 4, however, if they simply contain summaries or reformulations of information supplied by a source outside the government,[49] or contain information obtained through a plant

---

[47] See Bd. of Trade, 627 F.2d at 404 (concluding that scope of Exemption 4 is "restrict[ed]" to information that has "not been generated within the Government"); Det. Watch Network v. ICE, 215 F. Supp. 3d 256, 262-63 (S.D.N.Y. 2016) (holding that contract terms were not "obtained from a person" because they were "negotiated and agreed on by the Government" rather than "obtained from" the contractors and "simply incorporated into the final contracts"); Allnet Commc'n Servs. v. FCC, 800 F. Supp. 984, 988 (D.D.C. 1992) (declaring that "person" under Exemption 4 "refers to a wide range of entities including corporations, associations and public or private organizations other than agencies"), aff'd, No. 92-5351 (D.C. Cir. May 27, 1994); cf. Ctr. for Auto Safety v. U.S. Dep't of Treasury, 133 F. Supp. 3d 109, 124 (D.D.C. 2015) (ordering agency to revise Vaughn index after finding that index did not permit court to "determine whether the documents contain information 'obtained from a person' rather than information generated within Treasury").

[48] See Fed. Open Mkt. Comm. v. Merrill, 443 U.S. 340, 360 (1979) (concluding that "Exemption 5 incorporates a qualified privilege for confidential commercial information, at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract"); Morrison-Knudsen Co. v. Dep't of the Army of the U.S., 595 F. Supp. 352, 354-56 (D.D.C. 1984) (analyzing whether commercial information generated by the government  is withholdable under Exemption 5 after noting that "'[t]he theory behind a privilege for confidential commercial information generated in the process of awarding a [government] contract . . . is . . . that the Government will be placed at a competitive disadvantage or that consummation of the contract may be endangered'" (quoting Merrill, 443 U.S. at 360)), aff'd, 762 F.2d 138 (D.C. Cir. 1985).

[49] See, e.g., OSHA Data/C.I.H., Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 162 n.23 (3d Cir. 2000) (ratio calculated by agency, but based upon "individual components" supplied by private-sector employers); Gulf & W. Indus. v. United States, 615 F.2d 527, 529-30 (D.C. Cir. 1979) (contractor information contained in agency audit report); Elec. Privacy Info. Ctr. v. DHS, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (holding that identities of corporations were "obtained from a person," even when those names appeared in wholly intra-agency emails, because  corporations' names "originated with the corporations which provided their identities to DHS in order to participate in the program"); Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior, 36 F. Supp. 3d 384, 401 (S.D.N.Y. 2014) (Bureau of Land Management analysis of mine data provided by mining companies); Freeman v. Bureau of Land Mgmt., 526 F. Supp. 2d 1178, 1188 (D. Or. 2007) (finding that government's research "piggyback[ed] upon [submitter's] data to such an extent that the government's data [was] not truly independent for purposes of Exemption 4"); Dow Jones Co., 219 F.R.D. at 176 (power-plant information obtained by agency staff through interviews with "employees or representatives" of companies); Matthews v. USPS, No. 92-1208, slip op. at 6 (W.D. Mo.

11

inspection.⁵⁰ Moreover, the mere fact that the government supervises or directs the preparation of information submitted by sources outside the government does not preclude that information from being "obtained from a person."⁵¹ Similarly, the District Court for the District of Columbia has held that the fact that particular information is "arrived at through negotiation" with the government does not necessarily preclude it from being regarded as "obtained from a person."⁵²

---

Apr. 15, 1994) (technical drawings prepared by agency personnel, but based upon information supplied by computer company). But see COMPTEL v. FCC, 945 F. Supp. 2d 48, 57 (D.D.C. 2013) (agency "does not explain how all portions of a document prepared by its own staff can be considered 'obtained from a person'[...]while it is possible that the government relied on information from [submitter] to draft parts of the original version, it seems unlikely"); Phila. Newspapers, Inc. v. HHS, 69 F. Supp. 2d 63, 67 (D.D.C. 1999) (characterizing an agency audit as "not simply a summary or reformulation of information supplied by a source outside the government" and finding that an analysis "prepared by the government" is not "'obtained from a person'" and so "may not be withheld under Exemption 4").

⁵⁰ See, e.g., Lion Raisins Inc. v. USDA, 354 F.3d 1072, 1076 (9th Cir. 2004) (quality assessment of raisins, "including weight, color, size, sugar content, and moisture" reflected in "Line Check Sheets" prepared by USDA inspectors during plant visits); Mulloy v. Consumer Prod. Safety Comm'n, No. 85-645, 1985 U.S. Dist. LEXIS 17194, at *2 (S.D. Ohio Aug. 2, 1985) (manufacturing and sales data compiled in establishment inspection report prepared by Commission investigator after on-site visit to plant), aff'd, No. 85-3720 (6th Cir. July 22, 1986).

⁵¹ See High Country Citizens Alliance v. Clarke, No. 04-00749, 2005 WL 2453955, at *5 (D. Colo. Sept. 29, 2005) (finding that "when (1) an outsider compiles information on behalf of a client with whom it has a contractual relationship, (2) the client is also an outsider, and (3) the client has an expectation that the information will remain confidential, then the exemption may apply" and, here, submitter was in contractual relationship with another outside party, not agency, even though some agency supervision existed); Merit Energy Co. v. U.S. Dep't of the Interior, 180 F. Supp. 2d 1184, 1188 (D. Colo. 2001) (holding that "[e]ven where the compilation of information is directed by a government agency, it is still from a 'person' to the extent it is obtained from an entity outside the government" (citing Gulf & Western Indus., Inc., 615 F.2d at 530));. But cf. Consumers Union v. Veterans Admin., 301 F. Supp. 796, 803 (S.D.N.Y. 1969) (deciding that when "[t]he only things . . . obtained from outside the government were the hearing aids themselves," and the requested product testing on those hearing aids actually was performed by government personnel using their expertise and government equipment, the resulting data was not "obtained from a person" for purposes of Exemption 4).

⁵² Pub. Citizen Health Research Grp. v. NIH, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) (concluding that although a licensee's final royalty rate was the result of negotiation with the agency, that did "not alter the fact that the licensee is the ultimate source of [the] information," inasmuch as the licensee "must provide the information in the first instance"); cf. In Def. of Animals v. NIH, 543 F. Supp. 2d 83, 102-03 (D.D.C. 2008) (concluding that "incentive award" payments negotiated by the parties were not "obtained from a person,"

## **"Confidential" Information**

On June 24, 2019, the Supreme Court issued an opinion in Food Marketing Institute v. Argus Leader Media addressing the meaning of the word "confidential" in Exemption 4 that overturned over forty years of precedent.[53]

### Historical Interpretation of Exemption 4

The word "confidential" is not defined in the FOIA and over the years prior to Argus Leader, courts applied various tests to determine whether commercial and financial information provided to an agency fell within the parameters of Exemption 4.[54] In 1974, the Court of Appeals for the District of Columbia Circuit issued its decision in National Parks & Conservation Association v. Morton[55] which significantly altered the test for confidentiality under Exemption 4 and became the leading case on the issue until the Supreme Court's recent decision. Relying on legislative history, in National Parks the court determined that information should be treated as confidential if its disclosure would: 1) impair the government's ability to obtain necessary information in the future, or 2) cause substantial harm to the competitive position of the submitter of the information.[56] While establishing this two-prong test, the court expressly reserved the question of whether any other governmental interests might also be embodied in a "third prong."[57] Subsequent courts eventually did adopt a third prong to protect information that would compromise agency program compliance and effectiveness.[58]

---

because agency "nowhere demonstrated that the contractor was the source of information in the first instance and not the agency").

[53] See 139 S. Ct. 2356, 2363 (2019) (concluding that term "confidential" should be given its ordinary meaning as of time of FOIA's enactment, and holding that "term 'confidential' meant then, as it does now, 'private' or 'secret'").

[54] See Sterling Drug, Inc. v. FTC, 450 F.2d 698, 709 (D.C. Cir. 1971) (defining "confidential" based on whether information was of type not customarily released to public by submitter and which government "agreed to treat . . . as confidential"); GSA v. Benson, 415 F.2d 878, 881 (9th Cir. 1969) (defining "confidential" based on whether there was express or implied promise of confidentiality by government to submitting party); M.A. Schapiro & Co. v. SEC, 339 F. Supp. 467, 471 (D.D.C. 1972) (same).

[55] 498 F.2d 765 (D.C. Cir. 1974).

[56] Id. at 770.

[57] See id. at 770 n.17.

[58] See Critical Mass Energy Project v. NRC, 975 F.2d 871, 879 (D.C. Cir. 1992) (holding that "[i]t should be evident from this review that the two interests identified in the National Parks test are not exclusive"); Pub. Citizen Health Research Group v. NIH, 209 F. Supp. 2d

Nearly two decades later, the Court of Appeals for the District of Columbia Circuit returned to this issue in <u>Critical Mass Energy Project v. NRC</u>,[59] and, while reaffirming the <u>National Parks</u> test, the court confined the application of the <u>National Parks</u> test to information that was required to be provided to the government and established a separate standard for determining whether information "voluntarily" submitted to an agency is "confidential."[60]  Under <u>Critical Mass</u>, commercial or financial information that was "voluntarily" provided to the government was categorically protected as long as it was not customarily disclosed to the public by the submitter.[61]

<u>The Supreme Court's Decision in Food Marketing Institute v. Argus Leader Media</u>

In <u>Argus Leader</u> the Supreme Court addressed the question of "when does information provided to a federal agency qualify as 'confidential'" under Exemption 4.[62]  Noting that the FOIA itself does not provide a definition of the term "confidential," the court found that "as usual, [it must] ask what [the] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966."[63]  Citing Webster's Seventh New Collegiate Dictionary, the Court found that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'"[64]  The Supreme Court emphasized that "[n]otably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning is any mention of the 'substantial competitive harm' requirement" established in <u>National Parks</u>.[65]

The Court further held that "[c]ontemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential."[66]  First, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting

---

37, 52 (D.D.C. 2002) (holding that "impairment of the effectiveness of a government program is a proper factor for consideration in conducting an analysis under" Exemption 4).

[59] 975 F.2d 871, 879 (D.C. Cir. 1992).

[60] <u>Id.</u> at 875-79.

[61] <u>Id.</u>

[62] 139 S. Ct. at 2360.

[63] <u>Id.</u> at 2362 (quoting <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979)).

[64] <u>Id.</u> at 2363.

[65] <u>Id.</u>

[66] <u>Id.</u>

it."[67] Second, "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret."[68]

The Court determined that the first condition – that the information be kept private or closely held by the submitter – must always be met for information to be considered confidential.[69] As to the second condition – whether information must also be communicated to the government with assurances that it will be kept private – the Court found that it did not need to resolve that question, as that condition was clearly satisfied in the case before it.[70] In conclusion, the Court held that "at least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."[71]

The Department of Justice has recently issued guidance on the impact of the Supreme Court's decision in Argus Leader.[72]

## Privileged Information

The term "privileged" in Exemption 4 has been utilized by some courts as an alternative for protecting nonconfidential commercial or financial information. Indeed, the Court of Appeals for the District of Columbia Circuit has indicated that this term should not be treated as being merely synonymous with "confidential," particularly in light of the legislative history's explicit reference to certain privileges, e.g., the attorney-client and doctor-patient privileges.[73] Nevertheless, during the FOIA's first two decades, few district court decisions discussed "privilege" in the Exemption 4 context.

In one case, the court upheld the Department of the Interior's withholding of detailed statements by law firms of work that they had done for the Hopi Indians on the ground that they were "privileged" because of their work-product nature within the

---

[67] Id.

[68] Id.

[69] See id. (explaining that "it is hard to see how information could be deemed confidential if its owner shares it freely").

[70] See id. (noting that USDA had long history, codified in its regulations, of promising retailers that it would keep the requested data private).

[71] Id. at 2366.

[72] See OIP Guidance: Exemption 4 after the Supreme Court's Ruling in *Food Marketing Institute v. Argus Leader Media* (posted 10/3/2019); see also OIP Guidance: Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA (posted 10/3/2019).

[73] Wash. Post Co. v. HHS, 690 F.2d 252, 267 n.50 (D.C. Cir. 1982).

meaning of Exemption 4: "The vouchers reveal strategies developed by Hopi counsel in anticipation of preventing or preparing for legal action to safeguard tribal interests. Such communications are entitled to protection as attorney work product."[74] In the second case, a legal memorandum prepared for a utility company by its attorney qualified as legal advice protectible under Exemption 4 as subject to the attorney-client privilege.[75] In both of these cases the information was also withheld as "confidential."

It was not until another five years had passed that a court protected material relying solely on the "privilege" portion of Exemption 4 – specifically, by recognizing protection for documents subject to the "confidential report" privilege.[76] In a brief opinion, one court recognized Exemption 4 protection for settlement negotiation documents, but did not expressly characterize them as "privileged."[77] Another court subsequently recognized Exemption 4 protection for documents subject to the critical self-evaluative privilege.[78]

---

[74] Indian Law Res. Ctr. v. U.S. Dep't of the Interior, 477 F. Supp. 144, 148 (D.D.C. 1979).

[75] Miller, Anderson, Nash, Yerke & Wiener v. DOE, 499 F. Supp. 767, 771 (D. Or. 1980).

[76] Wash. Post Co. v. HHS, 603 F. Supp. 235, 237-39 (D.D.C. 1985), rev'd on procedural grounds & remanded, 795 F.2d 205 (D.C. Cir. 1986).

[77] M/A-COM Info. Sys. v. HHS, 656 F. Supp. 691, 692 (D.D.C. 1986); cf. Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc., 332 F.3d 976, 983 (6th Cir. 2003) (recognizing settlement negotiation privilege) (non-FOIA case).  But cf. COMPTEL v. FCC, 945 F. Supp. 2d 48, 58 (D.D.C. 2013) (agency "cannot justify its Exemption 4 redactions…merely by linking the documents to settlement discussions" and "'to the extent the FCC redacted information under Exemption 4 *solely* because it relates to settlement, the Court would reject such a justification'" (quoting COMPTEL v. FCC, 910 F. Supp. 2d 100, 117 (D.D.C. 2012))); Performance Aftermarket Parts Grp. v. TI Grp. Auto. Sys., No. 05-4251, 2007 WL 1428628, at *3 (S.D. Tex. May 11, 2007) (observing that Sixth's Circuit decision in Goodyear Tire & Rubber Co. "has not been widely followed," and concluding that "no 'settlement negotiations' privilege exists") (non-FOIA case); In re Subpoena Issued to Commodity Futures Trading Comm'n, 370 F. Supp. 2d 201, 208-10 (D.D.C. 2005) (refusing to recognize settlement negotiations privilege) (non-FOIA case), aff'd in part on other grounds, 439 F.3d 740, 754-55 (D.C. Cir. 2006) (finding it unnecessary to decide whether federal settlement negotiations privilege exists because proponent of privilege failed to meet its burden to show that disputed documents were created for purpose of settlement discussions).

[78] Wash. Post Co. v. DOJ, No. 84-3581, 1987 U.S. Dist. LEXIS 14936, at *21 (D.D.C. Sept. 25, 1987) (magistrate's recommendation), adopted, No. 84-3581 (D.D.C. Dec. 15, 1987), rev'd in part on other grounds & remanded, 863 F.2d 96, 99 (D.C. Cir. 1988).  But cf. Kan. Gas & Elec. Co. v. NRC, No. 87-2748, slip op. at 4 (D.D.C. July 2, 1993) (holding that because self-critical analysis privilege had been rejected previously in state court proceeding brought to suppress disclosure of documents, "doctrine of collateral estoppel" precluded "relitigation" of that claim in federal court) (reverse FOIA suit).

Sixteen years after the first decision protecting attorney-client information under Exemption 4, the District Court for the Eastern District of Missouri issued the second such decision.[79] The court held that a company's "adverse impact analyses, [prepared] at the request of its attorneys, for the purpose of obtaining legal advice about the legal ramifications of [large scale] reductions in force,"[80] were protected by the attorney-client privilege.[81] In so holding, the court found that disclosure of the documents to the agency "constituted only a limited waiver and did not destroy the privilege."[82] More recently, the District Court for the District of Columbia concluded that a corporate email was properly withheld under Exemption 4 "based on its attorney-client privileged nature."[83] There, the court explained that the email was labeled "Subject to Attorney-Client Privilege," and contained "an express request for legal advice."[84] However, a second email that lacked those characteristics was found not to be protected by attorney-client privilege under Exemption 4, even though the second email responded to information in the first and had an attorney 'cc-ed.'[85]

On the other hand, the Court of Appeals for the Tenth Circuit has held that documents subject to a state protective order entered pursuant to the State of Utah's equivalent of Rule 26(c)(7) of the Federal Rules of Civil Procedure – which permits courts to issue orders denying or otherwise limiting the manner in which discovery is conducted so that a trade secret or other confidential commercial information is not disclosed or is only disclosed in a certain way – were not "privileged" for purposes of Exemption 4.[86] While observing that discovery privileges "may constitute an additional ground for nondisclosure" under Exemption 4, the Tenth Circuit noted that those other privileges were for information "not otherwise specifically embodied in the language of Exemption 4."[87] By contrast, it concluded, recognition of a privilege for materials protected by a protective order under Rule 26(c)(7) "would be redundant and would substantially duplicate Exemption 4's explicit coverage of 'trade secrets and commercial or financial

---

[79] McDonnell Douglas Corp. v. EEOC, 922 F. Supp. 235, 237, 242-43 (E.D. Mo. 1996) (alternative holding) (reverse FOIA suit).

[80] Id. at 237.

[81] Id. at 242-43.

[82] Id. at 243.

[83] Jordan v. U.S. Dept. of Labor, 273 F. Supp. 3d 214, 227 (D.D.C. 2017), motion for reconsideration denied, 308 F. Supp. 3d 24 (D.D.C. 2018), aff'd, 2018 WL 5819393 (D.C. Cir. Oct. 19, 2018).

[84] Id. at 232.

[85] Id.

[86] Anderson v. HHS, 907 F.2d 936, 945 (10th Cir. 1990).

[87] Id.

information.'"[88] Additionally, the Court of Appeals for the Fifth Circuit has "decline[d] to hold that the [FOIA] creates a lender-borrower privilege," despite the express reference to such a privilege in Exemption 4's legislative history.[89] (For a further discussion of atypical privileges, see Exemption 5, Other Privileges, below.)

### Interrelation with the Trade Secrets Act

Finally, it should be noted that the Trade Secrets Act[90] – a broadly worded criminal statute – prohibits the disclosure of much more than simply "trade secret" information and instead has been held to prohibit the unauthorized disclosure of all data protected by Exemption 4.[91] (See the discussion of this statute under Exemption 3, Statutes Found Not to Qualify under Exemption 3, above.) Indeed, the Court of Appeals for the District of Columbia Circuit and nearly every court that has considered the issue has found the Trade Secrets Act and Exemption 4 to be "coextensive."[92] Thus, the D.C. Circuit has held

---

[88] Id.

[89] Sharyland Water Supply Corp. v. Block, 755 F.2d 397, 400 (5th Cir. 1985).

[90] 18 U.S.C. § 1905 (2006).

[91] See CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1140 (D.C. Cir. 1987) (noting that the Trade Secrets Act "appears to cover practically any commercial or financial data collected by any federal employee from any source" and that the "comprehensive catalogue of items" listed in the Act "accomplishes essentially the same thing as if it had simply referred to 'all officially collected commercial information' or 'all business and financial data received'") (reverse FOIA suit).

[92] See CNA Fin. Corp., 830 F.2d at 1151; accord Canadian Commercial Corp. v. Dep't of the Air Force, 514 F.3d 37, 39 (D.C. Cir. 2008) (quoting CNA Fin. Corp., 830 F.2d at 1151) (reverse FOIA suit); McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1185-86 (D.C. Cir. 2004) (same) (reverse FOIA suit), reh'g en banc denied, No. 02-5342 (D.C. Cir. Dec. 16, 2004); Bartholdi Cable Co. v. FCC, 114 F.3d 274, 281 (D.C. Cir. 1997) (citing CNA Fin. Corp., 830 F.2d at 1151) (declaring "[W]e have held that information falling within Exemption 4 of FOIA also comes within the Trade Secrets Act") (non-FOIA case brought under Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2006)); Boeing Co. v. U.S. Dep't of the Air Force, 616 F. Supp. 2d 40, 45 (D.D.C. 2009) (noting that D.C. Circuit "has 'long held' that the Trade Secrets Act and Exemption 4 are coextensive") (reverse FOIA suit). But see McDonnell Douglas Corp. v. Widnall, 57 F.3d 1162, 1165 n.2 (D.C. Cir. 1995) (noting in dicta that the court "suppose[s] it is possible that this statement [from CNA] is no longer accurate in light of [the court's] recently more expansive interpretation of the scope of Exemption 4" in Critical Mass Energy Project v. NRC, 975 F.2d 871, 879 (D.C. Cir. 1992)) (non-FOIA case brought under Administrative Procedure Act); Gen. Elec. Co. v. NRC, 750 F.2d 1394, 1402 (7th Cir. 1984) (reverse FOIA suit).

that if information falls within the scope of Exemption 4, it also falls within the scope of the Trade Secrets Act.[93]

The Trade Secrets Act, however, does not preclude disclosure of information "otherwise protected" by that statute, if the disclosure is "'authorized by law.'"[94]  (For a further discussion of this point, see Reverse FOIA, below.)  For that reason, the D.C. Circuit has concluded that it need not "attempt to define the outer limits" of the Trade Secrets Act – i.e., whether information falling outside the scope of Exemption 4 was nonetheless still within the scope of the Trade Secrets Act – because the FOIA itself would provide authorization for release of any information falling outside the scope of an exemption.[95]

---

[93] CNA Fin. Corp., 830 F.2d at 1151-52; see also Canadian Commercial Corp., 514 F.3d at 39 (noting that "unless another statute or a regulation authorizes disclosure of the information, the Trade Secrets Act requires each agency to withhold any information it may withhold under Exemption 4"); McDonnell Douglas Corp., 375 F.3d at 1185-86 (finding that the Trade Secrets Act "effectively prohibits an agency from releasing information subject to [Exemption 4]"); Bartholdi Cable Co., 114 F.3d at 281 (declaring that when information is shown to be protected by Exemption 4, agencies are generally "precluded from releasing" it due to provisions of Trade Secrets Act); Boeing Co., 616 F. Supp. 2d at 45 (holding that "when information falls within Exemption 4, the Trade Secrets Act compels an agency to withhold it"); Parker v. Bureau of Land Mgmt., 141 F. Supp. 2d 71, 77 n.5 (D.D.C. 2001) (noting that "[a]lthough FOIA exemptions are normally permissive rather than mandatory, the D.C. Circuit has held that the disclosure of material which is exempted under [Exemption 4 of the FOIA] is prohibited under the Trade Secrets Act").

[94] Bartholdi Cable Co., 114 F.3d at 281 (quoting Trade Secrets Act, 18 U.S.C. § 1905 (2006)).

[95] CNA Fin. Corp., 830 F.2d at 1152 n.139; see also Chrysler Corp. v. Brown, 441 U.S. 281, 318-19 & n.49 (1979) (noting in dicta that "there is a theoretical possibility that material might be outside Exemption 4 yet within the [Trade Secrets Act]," but acknowledging that "that possibility is at most of limited practical significance"); Frazee v. U.S. Forest Serv., 97 F.3d 367, 373 (9th Cir. 1996) (holding that because requested document was "not protected from disclosure under Exemption 4," it also was "not exempt from disclosure under the Trade Secrets Act") (reverse FOIA suit).